Michael Ryan Jones
JONES INTELLECTUAL PROPERTY
44 Court St #1217
Brooklyn, NY 11201
Telephone: (718) 500-0115

*Attorney for Tara Mapes d/b/a Tara Mapes Photography*

**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TARA MAPES d/b/a TARA MAPES PHOTOGRAPHY<br><br>Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No.: ________________<br><br>**COMPLAINT**<br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Tara Mapes d/b/a Tara Mapes Photography ("Plaintiff" or "Mapes"), by and through undersigned counsel, alleges as follows:

### NATURE OF THE ACTION

1. This action concerns the unauthorized reproduction, preparation of derivative works, distribution, and public display of Plaintiff Tara Mapes's copyrighted photographs and digital artworks through Facebook. Identified Facebook users, accounts, commercial pages, and editing-group participants reproduced Mapes's works, used them as source material for additional unauthorized composites, and redistributed the resulting copies and derivatives through Facebook without authorization. Plaintiff seeks to hold Meta Platforms, Inc. liable under the specific theories of secondary copyright infringement and violation of 17 U.S.C. § 1202(b)(3) alleged herein.

2. The Facebook infringement stream is not pleaded as a handful of isolated user uploads. The evidence identifies a recurring editing-group ecosystem in which a Mapes work or “blank” template is uploaded to a Facebook group; members download or copy it; members create new composites or edits using the work; those edited copies are displayed in comments, replies, albums, or new posts; and additional users may repost or further edit the same source work. A single source upload can therefore generate dozens of distinct reproductions, derivative works, displays, and redistributions.

3. Mapes’s business depends in part upon the limited licensing of completed digital backgrounds and the provision of custom editing services using those backgrounds. Her licenses generally permit photographer-licensees to use the works in connection with their own in-person photography sessions, while restricting redistribution of the files and remote editing services for third parties. The accused Facebook editing-group activity allegedly circumvented those restrictions by making the original backgrounds available to group members and enabling participants to perform the same types of compositing services Mapes offered commercially.

4. Across the broader record from October 2020 through September 30, 2026, the current compilation identifies 153 distinct numbered infringement reports, additional direct correspondence, and more than 4,200 reported-URL occurrences. These figures include repeated reports and references to the same material and therefore measure reporting activity rather than unique works, posts, infringements, or damages units.

5. The record also contains a highly developed direct-infringer package concerning Angelic Ice Photography / Tanisha Lloyd. That package alleges approximately 344 Facebook uses of Mapes works, including commercial promotion, derivative composites, replacement or removal of Mapes copyright-management information in numerous examples, and continued availability after notice.

6. In March 2025, Mapes submitted 17 Facebook copyright reports concerning Angelic Ice in one day. Mapes alleges that Facebook thereafter restricted her ability to submit additional copyright reports and displayed a warning that continued use of site features could lead to temporary blocking or permanent account disabling. Mapes then attempted alternative reporting channels, including support tickets, email addresses, a direct attorney contact, telephone support, and certified notices to Meta's registered agents.

7. The March-April 2025 sequence is central to the factual narrative because it is not merely "notice followed by non-removal." It includes alleged restriction of the reporting mechanism itself, redirection to the same mechanism Mapes said was unavailable, delivery through multiple alternative channels, Meta's later representation that content had been removed, Mapes's contemporaneous assertion that content remained accessible, and Meta's renewed requests for links and error proof that Mapes says had already been supplied.

8. A later September 2026 direct-notice campaign generated 53 unique direct notices to Meta identifying 145 distinct Facebook URLs. Those notices repeatedly stated that Meta's online copyright-reporting mechanisms were not functioning, were blocked, or were unable to process the reports. Preserved Meta case threads responded that email notices would not be reviewed unless they were submitted through the online reporting forms.

9. The current group evidence identifies eighteen Facebook editing groups with approximately 2.995 million aggregate memberships. Memberships overlap and are not pleaded as 2.995 million unique persons. The scale is relevant because the accused copying occurred inside organized communities whose purpose included requesting, creating, and exchanging image edits, and because the identity, role, uploader, administrator, moderation, complaint, and enforcement records are maintained by Meta.

## PARTIES

10. Plaintiff Tara Mapes is a photographer and visual artist residing in Guilford, Indiana. Mapes creates, markets, licenses, and sells original photographic and digital-art works and offers related custom compositing services. Her commercial activities have been conducted under the Tara Mapes Photography name and, where applicable, through Enchanted Eye Creations, Inc., subject to the ownership and licensing arrangements applicable to the particular works.

11. Defendant Meta Platforms, Inc. ("Meta") is a Delaware corporation with its principal place of business in Menlo Park, California. Meta operates Facebook and controls Facebook's account, page, group, post, comment, image-hosting, sharing, recommendation, moderation, reporting, enforcement, monetization, subscription, and advertising systems.

12. The underlying direct infringers include identified and presently unidentified Facebook account holders, page operators, group members, editors, uploaders, and administrators. Those persons are not presently joined as defendants in this action. Their identities, locations, individual conduct, personal jurisdiction, venue, service, joinder, and work-specific remedial issues will be evaluated separately as the evidentiary record permits.

## JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because the claims arise under the Copyright Act, 17 U.S.C. § 101 et seq.

14. Venue for copyright claims is governed by 28 U.S.C. § 1400(a). For an entity defendant, venue turns on where the defendant resides for purposes of the claim and the applicable personal-jurisdiction analysis.

15. This Court may exercise specific personal jurisdiction over Meta because the claims arise from Meta's operation of Facebook services in connection with identified New York-directed activity. The accused Facebook activity includes groups whose publicly displayed location is New York, New York; identified administrators or owners associated with New York; and Facebook

editing services offered or performed for New York residents, as set forth in Exhibit K. Meta supplied and controlled the Facebook account, group, hosting, administration, reporting, moderation, and distribution services through which that alleged New York activity occurred.

16. Upon information and belief, Meta maintained and operated the services through which the identified New York-based or New York-directed accounts, groups, administrators, and editing activity used Facebook. This inference is based on the identified group, administrator, and user information summarized in Exhibit K and on Meta's operation of Facebook's account, group, hosting, and distribution systems. Meta's account-location, administrator-role, group-history, service-use, and delivery records are expected to identify the New York connections associated with the accused activity.

17. One accused editing group, Photoshop Edits and Requests, Facebook Group ID 146965807263328, publicly lists New York, New York among its locations. The preserved group and profile records identify Zvi Twersky in connection with administration of that group and reflect public statements associating the account with New York. Plaintiff pleads the statements as public representations, not as conclusive proof of present domicile. Meta supplied the group, account, upload, hosting, comment, display, and distribution services used for the accused activity. The preserved records appear in Exhibit K.

18. A second accused editing group, Free Photoshop Requests: Photo Edits, Fixes & Restorations, Facebook Group ID 1691407778345208, is tied to the administrator account Teen Swag 2023. The preserved administrator roster identifies that account as an administrator, and the associated page publicly states 'Lives in New York, New York.' Plaintiff pleads that representation as stated and does not allege that it conclusively establishes legal domicile. The records appear in Exhibit K.

19. The preserved evidence also identifies an accused Santa with Magic Snow Globe derivative associated onscreen with the profile of Jennifer DeMartino-Bernstein, whose profile

publicly states 'From Brooklyn, New York.' Plaintiff pleads that statement as the profile's public representation, not as conclusive proof of current domicile or the location of every act. The profile and derivative evidence appear in Exhibit K.

20. Upon information and belief, during the relevant period at least some of the identified account holders and administrators accessed or administered the accused groups while physically located in New York, and Meta supplied the corresponding group, account, hosting, administration, and image-delivery services for that activity. This inference rests on the public New York location representations, the documented association of the accounts with the accused groups and content, and Meta's continuing provision of those services. Plaintiff believes Meta's login, administrator-action, upload, and content-delivery records will confirm the dates and locations of those transactions.

21. Plaintiff's claims arise from or bear a substantial relationship to those New York transactions. The relevant contacts are the operation and use of identified Facebook accounts and groups through which Mapes's works were allegedly copied, edited, displayed, and redistributed, not Meta's unrelated corporate activity or Facebook's general accessibility in New York. Meta operated the specific group, account, hosting, display, and distribution services used in the accused exchanges.

22. Upon information and belief, Meta also transmitted identified accused content to users located in New York, including content in the accused editing groups and on the identified pages and accounts. This inference is based on the New York-connected participants, the public operation of the identified groups and content, and Meta's ordinary delivery of Facebook content to participating users. Plaintiff believes Meta's content-delivery and impression records will confirm the New York delivery events associated with the identified content.

23. The exercise of specific jurisdiction comports with due process because Meta purposefully supplied the Facebook account, group, hosting, administration, and distribution services used in connection with the identified New York activity, and the claims concern Meta's operation of those same services. Venue is proper in this District under 28 U.S.C. § 1400(a) because Meta is

subject to personal jurisdiction in this District with respect to this action and may be found here for purposes of that statute.

24. Upon information and belief, members of the accused Facebook groups and recipients of the infringing posts included users located in New York, and Meta distributed, displayed, recommended, or otherwise made the accused material available to such users through its Facebook services. The precise number of New York users, impressions, recommendations, engagements, and advertising impressions associated with each identified post and group is information uniquely within Meta's possession and control.

## OVERVIEW OF ALLEGATIONS AND THEORIES OF LIABILITY

25. This action concerns recurring unauthorized use of Plaintiff Tara Mapes's registered photographs and digital artworks in identifiable Facebook accounts, commercial pages, and image-editing groups. Facebook users copied source works, created unauthorized composites, posted and redistributed derivatives, and publicly displayed resulting copies. Exhibit A identifies the registrations, works, and accused Facebook locations; Exhibit B provides representative original-to-accused comparisons; and Exhibits C and D identify the editing groups and representative source-to-derivative chains.

26. Two infringement patterns are central. First, the Santa with Magic Snow Globe evidence shows an editing-group workflow in which a source post generated numerous derivative edits and further distribution within Facebook (Exhibits B, C, D, and I). Second, the Angelic Ice Photography evidence concerns numerous accused uses of different Mapes works through an identified commercial account, including altered copies bearing substituted branding and repeated work-specific notices (Exhibits B, E, G, J, and M). Exhibit L preserves additional high-reach and commercial-page uses.

27. Meta received notices identifying particular works, Facebook URLs, content identifiers, accounts, groups, and recurring editing mechanisms. The notice record spans several years

(Exhibit F), includes the March-May 2025 Angelic Ice reports and reporting restriction (Exhibit G), and includes the later direct notices and Meta responses concerning failed reporting channels (Exhibit H). Exhibits I and M preserve repeat-participant evidence and notice-to-continued-availability comparisons. Plaintiff alleges internal Meta conduct upon information and belief where the external evidence supports the inference and the confirming records are maintained by Meta.

28. Count I alleges contributory infringement through inducement. Plaintiff does not allege that Meta is liable merely because Facebook is capable of infringement, because Meta knew that infringement occurred, or because Meta failed to remove content. Plaintiff alleges that, after receiving specific notice of the identified works, posts, accounts, groups, and copying chains, Meta intentionally undertook affirmative acts directed to the same activity, including selecting and distributing reported content, returning users to active editing threads, notifying users of new editing activity, recommending repeat-infringing groups, and facilitating additional participation. Upon information and belief, Meta undertook those acts to increase participation and content production in the identified editing communities, including the copying and adaptation of the specifically reported works (Exhibits D, F, G, H, I, and M).

29. Count II alleges vicarious infringement. Meta possessed the right and practical ability to supervise the particular posts, accounts, pages, groups, and distribution functions through which users infringed. Plaintiff further alleges, upon information and belief, that the unauthorized Mapes works themselves attracted editing, viewing, and repeat activity and that at least some work-specific sessions produced advertising impressions or other financial consideration for Meta. The claim rests on the identified editing chains and high-reach or commercial uses, not Meta's aggregate revenue or group membership alone (Exhibits D, G, H, L, and M).

30. Count III alleges violation of 17 U.S.C. Section 1202(b)(3). Plaintiff identifies authorized works bearing Mapes copyright-management information, accused Angelic Ice copies from which that information was removed or replaced, and March 24, 2025 notices expressly

identifying the alterations. The same Facebook content identifiers identified in the March 24 notices for Bear in Forest Looking Down and Bear in Foggy Forest were reported as still accessible on May 2, 2025 in the records identified by Mapes on October 17, 2026. Plaintiff alleges, upon information and belief, that Meta knowingly transmitted the identified altered files during that documented post-notice period and knew or had reasonable grounds to know that the distribution would facilitate or conceal infringement.

31. The factual sections that follow identify the registrations and predicate direct infringements; describe the Facebook editing and redistribution mechanisms; set out the notice, reporting, and enforcement chronology; and plead the specific conduct supporting each claim. Section 512 is addressed only as a potential limitation on liability: Plaintiff alleges that Meta did not satisfy the conditions for any applicable safe harbor, while Counts I through III rest on independent elements of liability.

## FACTUAL ALLEGATIONS

### PLAINTIFF'S COPYRIGHTED WORKS AND REGISTRATION RECORD

32. Plaintiff Tara Mapes is a professional photographer and digital artist who owns copyrights in numerous original photographs and digital artworks that she personally conceived, staged, photographed and/or created, edited, published, licensed, and sold. The relevant works include holiday, fantasy, portrait, children, and digital-background imagery that Mapes commercially exploits through her photography and digital-art business.

33. Mapes created the original photographic and digital-art expression asserted in this action and claims ownership of the relevant exclusive rights. To the extent particular works were marketed, licensed, or sold through Enchanted Eye Creations, Inc., or another business entity, the applicable registration and ownership records establish the person or entity holding the rights asserted in this action.

34. Mapes has registered numerous works relevant to the infringements alleged in this action with the United States Copyright Office. Among the registered works infringed through Facebook and the Facebook editing-group ecosystem described below are:

a. Dinosaur Chase in Florida Forest Tunnel on Dirt Path, U.S. Copyright Registration No. VA0002227723;

b. Santa Reading Book on Couch, U.S. Copyright Registration No. VA0002248504;

c. Santa with Magic Snow Globe, U.S. Copyright Registration No. VA0002151851;

d. Black Santa Sleeping on Couch, U.S. Copyright Registration No. VA0002284642; and

e. HOMESCHOOL, a group of eleven photographs, U.S. Copyright Registration No. VA0002528196.

35. The registered works identified above are associated with particular accused Facebook posts, accounts, pages, editing groups, unauthorized reproductions, derivative works, and copyright notices, as detailed in the allegations below and the accompanying exhibits. Where a registration encompasses multiple photographs or digital artworks, Plaintiff asserts infringement only of the particular constituent works identified in the supporting evidence. Exhibit A provides the corresponding registration information and identifies the particular images and accused Facebook uses to the extent presently established. Plaintiff does not allege that every photograph within a group registration was infringed merely because another photograph covered by that registration was used without authorization.

36. Facebook users obtained unauthorized copies of Mapes's copyrighted photographs and digital artworks, reproduced those works in Facebook editing groups, and created and distributed additional unauthorized derivative images without Mapes's permission.

37. The consolidated evidence archive contains additional registration numbers associated with other infringement matters. For Plaintiff's copyright infringement claims under 17 U.S.C. § 106, Plaintiff relies upon registered works specifically identified in this Complaint and tied to alleged

unauthorized Facebook uses. Plaintiff's separate claim under 17 U.S.C. § 1202(b)(3), however, concerns the knowing distribution of copyrighted works from which copyright management information was removed or altered without authorization and does not require that the underlying works be registered with the United States Copyright Office.

38. Registration No. VA0002451268 is identified in the registration record as 2025-1Q and is tied below to the specific Facebook use alleged concerning that registration.

39. Two September 29, 2026 Santa Globe notices initially used VA0002465949. Immediate correction emails stated that the correct registration is VA0002151851. Plaintiff therefore does not treat VA0002465949 as a separate Santa Globe registration.

40. Historical Facebook notices sometimes identify Santa Globe as "VA-2-151-851." That is the same registration as VA0002151851 and is not a separate copyright registration.

41. A separate archive entry identifies VA0002464858 in a dispute concerning Children's Territory. That entry is not presently alleged as part of the Meta/Facebook infringement stream and is not included merely to enlarge the registration count.

42. Where a copyright registration covers multiple photographs or digital artworks, Plaintiff asserts infringement only of the particular constituent images identified in the accompanying schedules and supporting evidence. Exhibit A identifies the relevant registration, the specific image within that registration alleged to have been infringed, and the corresponding accused Facebook use to the extent presently identified. Plaintiff does not allege that every image included within a group registration was necessarily infringed merely because another image covered by that registration was reproduced or distributed without authorization.

**Representative Listing of Plaintiff's Copyrighted Works**

| Registration No. | Copyrighted Work |
|---|---|
| VA0002151851 | Santa with Magic Snow Globe |
| VA0002227723 | Dinosaur Chase in Florida Forest Tunnel on Dirt Path |
| VA0002248504 | Santa Reading Book on Couch |
| VA0002284642 | Black Santa Sleeping on Couch |
| VA0002464853 | Horror Halloween |
| VA0002467149 | Faceless Dolls |
| VA0002451268 | 2025-1Q - Identified Constituent Photograph(s) |
| VA0002528196 | HOMESCHOOL |

**META'S FACEBOOK SYSTEMS AND CONTROL OVER THE ACCUSED ACTIVITY**

43. Meta provides and controls Facebook groups, pages, personal accounts, photo hosting, comments, replies, albums, group invitations, group recommendations, notifications, sharing tools, content moderation, intellectual-property reporting tools, account restrictions, page restrictions, group restrictions, subscriptions, advertising, boosts, and monetization systems.

44. Meta can remove or disable access to a specific photo, post, comment, page, or group; restrict or disable accounts; restrict or disable pages and groups; process copyright notices; apply strikes or repeat-infringer measures; and preserve records identifying the uploader and account responsible for particular content.

45. Meta maintains or can access account-registration data, linked email addresses and phone numbers, account identifiers, upload timestamps, content IDs, group administrator and moderator rosters, historical role changes, group creation data, name-change data, complaint history, internal escalation records, enforcement actions, removals, restorations, appeals, and, where applicable, advertising, subscription, boost, payment, and monetization records.

46. These records are material not only to the claims against Meta but also to the identification and prosecution of the direct infringers whose acts supply the predicate infringement for Meta's secondary-liability exposure.

**OVERALL FACEBOOK INFRINGEMENT ARCHITECTURE**

47. The group infringement pattern begins with a source work. In many instances, a Facebook user posts a Mapes image or blank digital background to an editing group and expressly or implicitly solicits edits.

48. Other group members then download, copy, screenshot, or otherwise reproduce the Mapes work and add people, animals, objects, text, seasonal elements, or other imagery to create derivative composites.

49. Those members then upload and publicly display the resulting composites in comments, replies, albums, or additional posts. The copies can be downloaded or reposted again, creating another generation of reproductions and derivative displays.

50. Mapes's original digital backgrounds are completed photographic or digital artworks embodying creative choices concerning subject matter, composition, arrangement, perspective, lighting, color, textures, visual effects, and other expressive elements. In the accused editing process, users frequently retained those protected elements while inserting additional people, objects, or visual material into the original scene.

51. The addition of new material did not, by itself, eliminate the protected expression reproduced from Mapes's original artwork. Where an accused composite incorporated recognizable protected elements of a Mapes work without authorization, the resulting use implicated Mapes's exclusive reproduction rights and, where applicable, her exclusive right to prepare derivative works.

52. Plaintiff does not claim copyright protection in the general idea of a fantasy background, a snow globe, a Christmas setting, or the technique of inserting a person into a digital scene. The asserted protection concerns the original expressive elements of the particular Mapes work reproduced or adapted in the accused image.

53. The evidence demonstrates this multiplication effect. A September 28, 2026 update documents one over 580,000-member group in which a single blank-template post generated

approximately 31 edits, and one approximately 81,000-member group in which a single source post generated approximately 15 edits.

54. A September 29, 2026 Jesus Globe notice identified 29 distinct Facebook URLs and described approximately 30 edits arising from the blank template. A separate Santa Globe notice described approximately 15 edits from one redistributed image.

55. The evidence also reflects repeat users and repeat groups. Multiple notices identify the same groups over successive years and identify particular users as repeat participants. Meta's account and group records are necessary to determine how many currently identified URLs are attributable to the same persons and which administrators personally participated in, solicited, or monetized infringement.

## WORK-BY-WORK PREDICATE INFRINGEMENT PACKAGES

### Santa with Magic Snow Globe - VA0002151851

56. The predicate infringement of Santa with Magic Snow Globe, Registration No. VA0002151851, spans repeated unauthorized reproduction, editing, redistribution, and public display of the work through Facebook users and editing groups over multiple years. The preserved record identifies numerous Facebook posts and derivative edits in which users obtained Mapes's Santa Globe image, used it as source material for additional composites, and redistributed the resulting copies and derivatives without Mapes's authorization.

57. Historical notices identify the same registration in repeated reports and describe users as downloading, redistributing, sharing, and editing the work without authorization. The 2024 report set again identifies VA0002151851 and asks Meta to preserve records and investigate repeat infringers and groups.

58. The 2026 evidence shows the same work continuing to circulate in established editing groups and in a Snow Globe-specific spin-off group. Current notices identify blank-template redistribution, albums, numerous edited responses, and dozens of current Facebook URLs.

59. Representative predicate infringements of Santa with Magic Snow Globe include unauthorized uploads of the work as a source or blank template, unauthorized reproduction of the work in derivative composites, redistribution of those copies through Facebook editing groups, and public display of resulting edits through Facebook posts, comments, albums, and replies. The preserved records identify the particular Facebook URLs, groups, accounts, report numbers, and notice dates associated with those uses. The repeated appearances of the same work across different users, groups, and years are pleaded as separate direct infringements where the evidence establishes a distinct reproduction, derivative work, distribution, or display, while repeated reporting of the same URL is not treated as a separate direct infringement.

60. Representative predicate infringements of Santa with Magic Snow Globe include repeated unauthorized use within the Facebook editing group Free Photo Edits ORIGINAL, which Mapes identified as having approximately 581,000 members. On September 29, 2026, Mapes sent Meta a direct DMCA notice identifying an unauthorized edit bearing Facebook content identifier 1656193321997637. The notice identified Registration No. VA0002151851, identified Facebook Group ID 1062897731479032, stated that the accused image was an edit of Mapes's Santa Globe template by a repeat infringer, and stated that Mapes had not authorized the user or group member to upload, reproduce, distribute, edit, share, or otherwise use the work.

61. Mapes separately notified Meta on September 29, 2026 of another unauthorized Santa Globe derivative within the same Free Photo Edits ORIGINAL group bearing Facebook content identifier 590163893700337. That notice described the accused image as an edit made by a group member who obtained a copy of the Santa Globe template from the group post offering edits. The notice again identified Registration No. VA0002151851 and the approximately 581,000-member group and advised Meta that a single unauthorized source posting could result in numerous additional edits and uses by group members.

62. The record also contains a distinct Santa Globe infringement within the Facebook group identified in Mapes's records as “Snow Globe photo making,” group ID 1527138444445851. On December 13, 2025, Mapes submitted Copyright Report No. 697352476551094 identifying the accused Facebook photograph bearing content identifier 10162720573292182. The report identified the accused user as Donnalee Snajkowski, identified Santa with Magic Snow Globe, Registration No. VA0002151851, and stated that the user had no authorization to use, edit, or redistribute Mapes's image. Meta acknowledged receipt of that report.

63. On December 16, 2025, Mapes advised Meta that the content reported under Report No. 697352476551094 remained active after Meta had responded that the reported content appeared different from her work. Mapes supplied side-by-side comparison evidence and renewed notice identifying the same Facebook URL. The recovered record reflects a later Meta removal statement on December 19, 2025.

64. These examples are representative rather than exhaustive. The preserved Santa Globe record identifies additional Facebook groups, users, posts, derivative edits, and reported URLs involving the same registered work. Plaintiff distinguishes separate reproductions, derivative works, distributions, and public displays from repeated reporting of the same URL and does not treat duplicate notices as separate predicate infringements.

**Santa Reading Book on Couch - VA0002248504**

65. Santa Reading Book on Couch, Registration No. VA0002248504, was repeatedly reproduced and used without authorization in Facebook editing activity and by Angelic Ice Photography. The preserved record identifies Facebook users offering edits using Mapes's actual Santa Reading image in 2022 and multiple later Angelic Ice posts and composites incorporating the same registered work in 2025

66. The Angelic Ice schedule includes multiple Facebook photo URLs and several older Angelic Ice page-photo URLs for the Santa Reading work, demonstrating repeated use of the same registered work across multiple posts rather than one isolated upload.

67. A separate 2022 copyright report concerning Santa Reading Book on Couch identified multiple accused Facebook locations and stated that the users were offering edits using Mapes's actual copyrighted image. Among the reported locations were Facebook content identifiers 10225280165125905, 10225280167245958, and 10224676518275111. Mapes stated in the report that the accused users were offering edits into her image without authorization.

68. The March 23, 2025 Angelic Ice reporting record supplies an additional direct-infringement example. Copyright Report No. 661756919867758 identified Santa Reading Book on Couch as the protected source work and listed multiple accused Angelic Ice Facebook photographs, including Facebook content identifier 915400503490747, together with additional Angelic Ice page-photo locations. Mapes stated that the accused material was her actual work being used without authorization.

**Dinosaur Chase - VA0002227723**

69. Dinosaur Chase, Registration No. VA0002227723, was used without authorization in multiple accused Angelic Ice Facebook composites. The preserved side-by-side evidence identifies Mapes's dinosaur imagery as source material incorporated into Angelic Ice photographs and composites that were then displayed through Facebook without Mapes's permission.

70. The March 23, 2025 Angelic Ice records include a copyright report concerning a Mapes dinosaur background that identified three accused Angelic Ice Facebook photographs bearing content identifiers 1020250089672454, 941778204186310, and 925082242522573. The report identified the accused content as copying Mapes's work and was submitted against the Angelic Ice account.

71. The side-by-side Angelic Ice package independently preserves dinosaur-background source images and accused Angelic Ice composites, allowing the accused Facebook displays to be compared directly against Mapes's source imagery. Plaintiff alleges that the resulting accused composites reproduced protected elements of Mapes's work and were publicly displayed through the Angelic Ice Facebook account without authorization.

**Black Santa Sleeping on Couch - VA0002284642**

72. Black Santa Sleeping on Couch, Registration No. VA0002284642, was reproduced and publicly displayed without authorization on the BlackDoctor.org Facebook business page. Mapes identified the accused Facebook post bearing content identifier 10158792021811194 and stated in her December 2021 copyright reports that BlackDoctor.org was using her actual photographed image without her permission.

73. The early notice predates the later group ecosystem and is representative evidence that Mapes had already been using Facebook’s copyright reporting mechanisms and disputing removal outcomes years before the March 2025 blocking episode.

74. The accused Facebook location was the BlackDoctor.org post bearing content identifier 10158792021811194. In her December 23, 2021 report, Mapes identified the protected source photograph and stated that BlackDoctor.org was displaying her actual photograph on its business page without her permission.

75. Mapes subsequently submitted repeated reports concerning the same accused BlackDoctor.org use, including Report Nos. 5054037441283785, 340043124251708, 492392462190162, and 1317888405393609. Her later escalation advised Meta that she had received responses stating that the content had been removed while she continued to observe the accused photograph at the identified Facebook location.

76. The BlackDoctor.org sequence therefore identifies a specific copyrighted work, a specific commercial Facebook page, a specific accused URL, repeated notices concerning the same

accused use, Meta acknowledgments and removal communications, and Mapes's subsequent assertions that the material remained accessible.

**Horror Halloween - VA0002464853**

77. A photograph included within Horror Halloween Tara Mapes, Registration No. VA0002464853, was separately reproduced and uploaded without authorization by multiple Facebook pages, including Quick Clever Tips / Creative Tutorials and Weirdo History Facts. Mapes's September 2026 notices identified the original photograph, the accused Facebook locations, and the absence of any license or permission for those pages to reproduce, upload, display, or distribute the work.

78. On September 27, 2026, Mapes sent Meta a direct copyright notice identifying an original photograph of a woman wearing a plague-doctor mask as a work included in Horror Halloween Tara Mapes, Registration No. VA0002464853. The notice alleged that the Facebook page Quick Clever Tips / Creative Tutorials had downloaded the photograph and uploaded an unauthorized copy bearing Facebook content identifier 1666912758138342. Mapes expressly stated that the page had no license or authorization to reproduce, upload, display, or distribute the photograph.

79. The same day, Mapes separately notified Meta that Weirdo History Facts had reproduced and uploaded the same registered photograph without authorization in an identified Facebook post bearing content identifier 421829262632810. The notice identified the original work, Registration No. VA0002464853, the accused Facebook page, and the specific accused post.

80. These are distinct accused Facebook uses by separate pages and supply separate predicate direct-infringement examples involving the same registered photograph. Mapes separately notified Meta of each accused location.

**Faceless Dolls - VA0002467149**

81. Faceless Dolls, Registration No. VA0002467149, was reproduced and used without authorization in connection with promotion of a paid photography workshop. Mapes alleges that the

accused infringer downloaded or screenshotted her registered photographs, used those images in advertising for the workshop, and used the protected imagery as the basis for recreating Mapes's photographic work.

82. Mapes also informed Meta of the related Copyright Claims Board proceeding, *Mapes v. Yang*, Case No. 25-CCB-0505, and supplied side-by-side comparisons after Meta questioned whether the reported material matched her work.

83. The Faceless Dolls infringement record identifies Report Nos. 1311338261037819 and 1835782817029523, submitted in November 2025 concerning Registration No. VA0002467149. Mapes informed Meta that the accused infringer had downloaded or screenshotted Mapes's photographs and used them in advertisements promoting a paid workshop whose purpose was to recreate Mapes's Faceless Dolls imagery.

84. Mapes further informed Meta that the same conduct was the subject of *Mapes v. Yang*, Copyright Claims Board Case No. 25-CCB-0505. After Meta responded that the reported images appeared to be different from Mapes's work, Mapes supplied registration information, URL-specific notice, and side-by-side comparison evidence supporting her allegation that the accused material reproduced or created substantially similar derivatives of the registered photographs.

85. The Faceless Dolls record therefore supplies an identified registered work, an identified direct infringer, commercial promotional use of the copied source photographs, specific Meta report numbers, side-by-side infringement evidence, and repeated notice to Meta concerning the same underlying infringement.

86. The particular photographs within the Faceless Dolls registration alleged to have been infringed are identified in the corresponding image schedule in Exhibit A to the extent supported by the preserved comparisons and accused Facebook records. Plaintiff does not allege that all photographs within the registration were necessarily infringed merely because one or more registered photographs were used without authorization.

**2025-1Q - VA0002451268**

87. Mapes submitted a Meta intellectual-property report concerning a photograph included within Registration No. VA0002451268. The report identified Mapes's authorized photograph of a girl in a beige dress and alleged that Iconic Child Magazine downloaded and displayed the photograph on its Facebook page to advertise an upcoming issue of its digital magazine without Mapes's permission.

88. The report identified both the authorized source photograph and the accused Facebook photograph and stated that Iconic Child Magazine was not authorized to download, use, or display Mapes's image. The accused use therefore supplies an additional predicate reproduction and public display of a registered Mapes photograph in connection with a promotional Facebook use.

**FACEBOOK EDITING GROUPS - CURRENT GROUP-BY-GROUP ALLEGATIONS**

89. The preserved evidence identifies eighteen Facebook editing groups in the current consolidated schedule, with approximately 2.995 million aggregate memberships as of the period reflected in the evidence. Memberships may overlap, and the figure is not alleged to represent unique persons. Exhibit C identifies the groups, their available identifiers, approximate membership counts, and representative accused activity. Where two groups use the same display name, Plaintiff identifies them by their distinct stable identifiers.

**Edit My Photo Please (Facebook Group ID 434641910268232)**

90. The evidence identifies “Edit My Photo Please” as Facebook group identifier 434641910268232, with approximately 241,100 members in the September 2026 group schedule. The membership figure is used as a scale indicator and is not alleged to represent unique persons across all groups.

**PhotoSHOP Edits & Requests (Facebook Group ID 470476367119497)**

91. The evidence identifies “PhotoSHOP Edits & Requests” as Facebook group identifier 470476367119497, with approximately 212,600 members in the September 2026 group schedule.

The membership figure is used as a scale indicator and is not alleged to represent unique persons across all groups.

**Photoshop Edits and Requests (Facebook Group ID 146965807263328)**

92. The evidence identifies “Photoshop Edits and Requests” as Facebook group identifier 146965807263328, with approximately 19,600 members in the September 2026 group schedule. The membership figure is used as a scale indicator and is not alleged to represent unique persons across all groups.

**Edit My Picture & AI Video (Facebook Group ID 215135069217660)**

93. The evidence identifies “Edit My Picture & AI Video” as Facebook group identifier 215135069217660, with approximately 33,900 members in the September 2026 group schedule. The membership figure is used as a scale indicator and is not alleged to represent unique persons across all groups.

**Edit My Picture (Free Photo Editing Group) (Facebook Group ID 106553683339496)**

94. The evidence identifies “Edit My Picture (Free Photo Editing Group)” as Facebook Group ID 106553683339496, with approximately 66,900 members according to Mapes's supplemental evidence. The membership figure is used as an approximate measure of the group's size and is not alleged to represent unique persons across the identified Facebook groups.

**Free Photo Editing for Everybody (Facebook group identifier freephotoeditingforeverybody)**

95. The evidence identifies “Free Photo Editing for Everybody” as Facebook group identifier freephotoeditingforeverybody, with approximately 24,300 members in the September 2026 group schedule. The membership figure is used as a scale indicator and is not alleged to represent unique persons across all groups.

**TWEAKERS - Restoring Yesterday to Today (Facebook Group ID 1776751895934678)**

96. The evidence identifies “TWEAKERS - Restoring Yesterday to Today” as Facebook group identifier 1776751895934678, with approximately 23,200 members in the September 2026

group schedule. The membership figure is used as a scale indicator and is not alleged to represent unique persons across all groups.

**Please Edit My Photos For Free (Facebook Group ID 1211763358888843)**

97. The evidence identifies “Please Edit My Photos For Free” as Facebook group identifier 1211763358888843, with approximately 97,400 members in the September 2026 group schedule. The membership figure is used as a scale indicator and is not alleged to represent unique persons across all groups.

**Official Edit My Photo Please (Facebook Group ID 978358915630800)**

98. The evidence identifies “Official Edit My Photo Please” as Facebook group identifier 978358915630800, with approximately 37,700 members in the September 2026 group schedule. The membership figure is used as a scale indicator and is not alleged to represent unique persons across all groups.

**Free Photoshop Edit and Requests**

99. The evidence identifies “Free Photoshop Edit and Requests” as Facebook group identifier @freephotoshopeditsandrequest, with approximately 138,000 members in the September 2026 group schedule. The membership figure is used as a scale indicator and is not alleged to represent unique persons across all groups.

**Photoshop Edit and Requests ORIGINAL (Facebook Group ID 651092126512097)**

100. The evidence identifies “Photoshop Edit and Requests ORIGINAL” as Facebook group identifier 651092126512097, with approximately 84,000 members in the September 2026 group schedule. The membership figure is used as a scale indicator and is not alleged to represent unique persons across all groups.

**Free Photo Editing (Facebook Group ID 297187839999791)**

101. The evidence identifies “Free Photo Editing” as Facebook group identifier 297187839999791, with approximately 140,000 members in the September 2026 group schedule.

The membership figure is used as a scale indicator and is not alleged to represent unique persons across all groups.

**Free Photo Edits ORIGINAL (Facebook Group ID 1062897731479032)**

102. The evidence identifies "Free Photo Edits ORIGINAL" as Facebook group identifier 1062897731479032, with over 580,000 members in the September 2026 group schedule. The membership figure is used as a scale indicator and is not alleged to represent unique persons across all groups.

**Free Photo Editing Group (Facebook Group ID 940840924057399)**

103. The evidence identifies "Free Photo Editing Group" as Facebook group identifier 940840924057399, with approximately 693,000 members in the September 2026 group schedule. The membership figure is used as a scale indicator and is not alleged to represent unique persons across all groups.

**Free Photoshop Requests: Photo Edits, Fixes & Restorations (Facebook Group ID 1691407778345208)**

104. The evidence identifies "Free Photoshop Requests: Photo Edits, Fixes & Restorations" as Facebook group identifier 1691407778345208, with approximately 81,000 members in the September 2026 group schedule. The membership figure is used as a scale indicator and is not alleged to represent unique persons across all groups.

**SNOW GLOBE Picture Editing GROUP (Facebook Group ID 1686824895509474)**

105. The evidence identifies "SNOW GLOBE Picture Editing GROUP" as Facebook group identifier 1686824895509474, with approximately 3,500 members in the September 2026 group schedule. The membership figure is used as a scale indicator and is not alleged to represent unique persons across all groups.

**Please Edit My Photos For Free (Facebook Group IDs 1211763358888843 and 1165679583445573)**

106. The September 28 schedule identifies "Please Edit My Photos For Free" at group ID 1211763358888843 with approximately 97,400 members. A September 29 repeat-group notice identifies a similarly named group at ID 1165679583445573 with approximately 102,900 members and a notice labeled 17 links.

**PHOTOSHOP REQUESTS (Facebook Group ID 25029595587)**

107. The evidence identifies "PHOTOSHOP REQUESTS" as Facebook Group ID 25029595587, with approximately 416,000 members according to Mapes's supplemental evidence. The membership figure is used as an approximate measure of the group's size and is not alleged to represent unique persons across the identified Facebook groups.

**Representative 2026 Facebook Content Identifier Schedule**

| Group | Accused URL Location | Facebook Content or Group Identifier |
|---|---|---|
| Edit My Photo Please | https://www.facebook.com/groups/editmyphoto/permalink/1289925928073155 | 1289925928073155 |
| | https://www.facebook.com/photo/?fbid=1935784596519501&set=gm.723122728086814 | 1935784596519501 |
| | https://www.facebook.com/photo.php?fbid=10156876527434383&set=p.10156876527434383&type=3 | 10156876527434383 |
| | https://www.facebook.com/photo.php?fbid=10158113900026559&set=p.10158113900026559&type=3 | 10158113900026559 |
| PhotoSHOP Edits & Requests | https://www.facebook.com/photo/?fbid=1541103213949193&set=g.470476367119497 | 1541103213949193 |
| | https://www.facebook.com/photo/?fbid=1118229293026166&set=g.470476367119497 | 1118229293026166 |
| | https://www.facebook.com/photo/?fbid=10169814800155331&set=g.470476367119497 | 10169814800155331 |
| | https://www.facebook.com/photo.php?fbid=10227516035183390&set=p.10227516035183390&type=3 | 10227516035183390 |

| Group | Accused URL Location | Facebook Content or Group Identifier |
|---|---|---|
| Photoshop Edits and Requests | https://www.facebook.com/photo/?fbid=10231676614452700&set=g.146965807263328 | 10231676614452700 |
| | https://www.facebook.com/photo/?fbid=8440832062693205&set=g.146965807263328 | 8440832062693205 |
| | https://www.facebook.com/photo/?fbid=3914470085503654&set=g.146965807263328 | 3914470085503654 |
| | https://www.facebook.com/photo.php?fbid=3604175819842191&set=p.3604175819842191&type=3 | 3604175819842191 |
| Edit My Picture & AI Video | https://www.facebook.com/groups/215135069217660/permalink/1475883679809453/ | 1475883679809453 |
| | https://www.facebook.com/photo.php?fbid=9278899842139007&set=p.9278899842139007&type=3 | 9278899842139007 |
| | https://www.facebook.com/photo.php?fbid=885865739773153&set=p.885865739773153&type=3 | 885865739773153 |
| | https://www.facebook.com/photo.php?fbid=885857123107348&set=p.885857123107348&type=3 | 885857123107348 |
| Edit My Picture (Free Photo Editing Group) | https://www.facebook.com/groups/106553683339496 | 106553683339496 |
| Free Photo Editing for Everybody | https://www.facebook.com/photo.php?fbid=10211931682404712&set=p.10211931682404712&type=3 | 10211931682404712 |
| | https://www.facebook.com/photo.php?fbid=10234934091563369&set=p.10234934091563369&type=3 | 10234934091563369 |
| | https://www.facebook.com/photo.php?fbid=10234934088123283&set=p.10234934088123283&type=3 | 10234934088123283 |
| | https://www.facebook.com/photo.php?fbid=10234934084963204&set=p.10234934084963204&type=3 | 10234934084963204 |
| TWEAKERS: Restoring Yesterday to Today | https://www.facebook.com/photo.php?fbid=10232404909245690&set=p.10232404909245690&type=3 | 10232404909245690 |
| | https://www.facebook.com/photo.php?fbid=10232404242629025&set=p.10232404242629025&type=3 | 10232404242629025 |

| Group | Accused URL Location | Facebook Content or Group Identifier |
|---|---|---|
| | https://www.facebook.com/photo.php?fbid=364095626084346&set=p.364095626084346&type=3 | 364095626084346 |
| | https://www.facebook.com/photo.php?fbid=364089556084953&set=p.364089556084953&type=3 | 364089556084953 |
| Please Edit My Photos For Free: Group ID 1211763358888843 | https://www.facebook.com/photo/?fbid=1310569763441159&set=pcb.9493231787356936 | 1310569763441159 |
| | https://www.facebook.com/photo.php?fbid=10211922859024133&set=p.10211922859024133&type=3 | 10211922859024133 |
| | https://www.facebook.com/photo?fbid=25052805620985692&set=pcb.7609279862418814 | 25052805620985692 |
| | https://www.facebook.com/photo.php?fbid=1723788244776188&set=p.1723788244776188&type=3 | 1723788244776188 |
| Official Edit My Photo Please | https://www.facebook.com/photo.php?fbid=10157280669711503&set=p.10157280669711503&type=3 | 10157280669711503 |
| | https://www.facebook.com/photo.php?fbid=10157280670531503&set=p.10157280670531503&type=3 | 10157280670531503 |
| Free Photoshop Edit and Requests | https://www.facebook.com/photo.php?fbid=3302418886559392&set=p.3302418886559392&type=3 | 3302418886559392 |
| Photoshop Edit and Requests ORIGINAL | https://www.facebook.com/photo/?fbid=4799817906911063&set=pcb.1090484815906157 | 4799817906911063 |
| | https://www.facebook.com/photo.php?fbid=4799880830238104&set=p.4799880830238104&type=3 | 4799880830238104 |
| | https://www.facebook.com/photo.php?fbid=10232765892384660&set=p.10232765892384660&type=3 | 10232765892384660 |
| | https://www.facebook.com/photo.php?fbid=3586932538117236&set=p.3586932538117236&type=3 | 3586932538117236 |
| Free Photo Editing | https://www.facebook.com/photo/?fbid=10161095960024051&set=pcb.490637207321519 | 10161095960024051 |
| | https://www.facebook.com/groups/297187839999791/permalink/490637207321519/ | 490637207321519 |

| Group | Accused URL Location | Facebook Content or Group Identifier |
|---|---|---|
| Free Photo Edits ORIGINAL | https://www.facebook.com/photo.php?fbid=1656229551994014&set=p.1656229551994014&type=3 | 1656229551994014 |
| | https://www.facebook.com/photo.php?fbid=1656193321997637&set=p.1656193321997637&type=3 | 1656193321997637 |
| | https://www.facebook.com/photo.php?fbid=1656229688660667&set=p.1656229688660667&type=3 | 1656229688660667 |
| | https://www.facebook.com/photo.php?fbid=590163893700337&set=p.590163893700337&type=3 | 590163893700337 |
| Free Photo Editing Group | https://www.facebook.com/photo?fbid=1716453805596614&set=pcb.1130778265063663 | 1716453805596614 |
| | https://www.facebook.com/photo.php?fbid=8455592251211652&set=p.8455592251211652&type=3 | 8455592251211652 |
| | https://www.facebook.com/photo/?fbid=10169815208825331&set=pcb.1111312363676920 | 10169815208825331 |
| | https://www.facebook.com/photo.php?fbid=10161861794633996&set=p.10161861794633996&type=3 | 10161861794633996 |
| Free Photoshop Requests: Photo Edits, Fixes & Restorations | https://www.facebook.com/photo.php?fbid=8834683536627139&set=p.8834683536627139&type=3 | 8834683536627139 |
| | https://www.facebook.com/photo.php?fbid=8771304892965004&set=p.8771304892965004&type=3 | 8771304892965004 |
| | https://www.facebook.com/photo/?fbid=8738297909552432&set=pcb.1755975318555120 | 8738297909552432 |
| | https://www.facebook.com/photo.php?fbid=8738295916219298&set=p.8738295916219298&type=3 | 8738295916219298 |
| SNOW GLOBE Picture Editing GROUP | https://www.facebook.com/photo/?fbid=1023054063039124&set=pcb.170581504943792 | 1023054063039124 |
| Please Edit My Photos For Free | https://www.facebook.com/photo.php?fbid=10232303710081980&set=p.10232303710081980&type=3 | 10232303710081980 |
| PHOTOSHOP REQUESTS | https://www.facebook.com/photo.php?fbid=8892218224176776&set=p.8892218224176776&type=3 | 8892218224176776 |

108. The accompanying exhibit schedules preserve the complete accused URLs associated with the identified groups. The allegations above identify representative groups, works, accused locations, multiplication patterns, and content identifiers, while the exhibits preserve the broader identified URL population.

109. Because Facebook group names may be changed, duplicated, or reused, Plaintiff identifies the accused editing communities principally by the available stable group identifiers rather than by display names alone. Plaintiff does not assume that similarly named groups are the same legal or operational community without evidence linking their creation, administration, or activity.

110. Users viewed the source work, downloaded it, requested edits, created derivatives, uploaded completed edits, reviewed other users' edits, commented upon them, reacted to them, shared them, and returned to the relevant post as additional activity accumulated.

111. The evidence demonstrates the scale of that effect. In one Facebook editing group with over 580,000 members, one unauthorized Mapes source image generated approximately 30 to 31 separate edits. In another approximately 81,000-member group, one source post generated approximately 15 edits. Mapes's September 2026 review also identified approximately 44 additional infringement/post URLs within six newly identified editing groups.

**REPRESENTATIVE PAGE-LEVEL AND COMMERCIAL FACEBOOK INFRINGERS**

112. The Facebook evidence is not limited to editing groups. It also identifies page-level and commercial uses that provide additional predicate direct infringements.

113. On September 25, 2026, Mapes notified Meta that the Facebook page Cinepage, Page ID 61577070292055, had copied and reuploaded without authorization Mapes's HOMESCHOOL series of eleven paper-mâché-mask photographs. The notice identified the specific accused post and informed Meta that Cinepage solicited users to purchase paid subscriptions immediately beneath the unauthorized images. Mapes published the HOMESCHOOL photographs on September 25, 2026, and submitted Copyright Office Application Case ID 1-15268390511 that same day. The Copyright

Office subsequently registered the HOMESCHOOL series under Registration No. VA0002528196, effective September 25, 2026.

114. On September 27, 2026, Mapes notified Meta that the Facebook page Quick Clever Tips / Creative Tutorials had reproduced a photograph included within Horror Halloween Tara Mapes, U.S. Copyright Registration No. VA0002464853, at an identified Facebook photo URL without authorization (See Exhibits B, H, and L).

115. The same day, Mapes notified Meta that Weirdo History Facts, described in the notice as having more than 900,000 followers, had reproduced and uploaded the same VA0002464853 Horror Halloween photograph without permission. (See Exhibits B, H, and L)

116. The Angelic Ice page and associated account represent the most developed commercial Facebook direct-infringer package presently in the evidence. The alleged conduct includes repeated use, derivative composites, CMI alteration or replacement in multiple examples, commercial promotion, and continuation after notice.

**FACTUAL SYNTHESIS OF THE FACEBOOK INFRINGEMENT PATTERN**

117. Taken together, the evidence does not describe a single rogue post or a generalized allegation that "people on Facebook infringe." It identifies specific registered works, specific groups, specific pages, specific URLs, particular repeat accounts in numerous notices, report numbers, case tokens, screenshots, side-by-side comparisons, and years of notice history.

118. The pattern is repetitive and scalable: a Mapes source image is injected into an editing community; users make copies and derivative composites; the resulting copies are publicly displayed in Facebook comments, albums, posts, and pages; some are redistributed into additional groups; and the same work can recur in the same ecosystem year after year.

119. The 2026 Snow Globe spin-off group is especially probative of ecosystem behavior because the notice describes a group organized around the work itself, an album making the blank template available, and instructions or solicitation encouraging members to create edits from it.

120. The over 580,000-member Free Photo Edits ORIGINAL example and the 81,000-member Free Photoshop Requests example demonstrate the same multiplication mechanism in larger communities: one source post produces dozens of derivative responses.

121. A preserved 2020 example further illustrates downstream redistribution beyond the originating editing group. A Facebook participant stated that she had uploaded a Mapes image obtained through an editing group to the Photo Lab application and demonstrated use of the image in that application. Mapes later contacted the application and obtained removal. Plaintiff relies on that episode as evidence of the downstream redistribution potential of Facebook editing-group activity, not to attribute Photo Lab's independent conduct to Meta.

122. The Angelic Ice evidence adds a commercial dimension: the accused user allegedly used Mapes imagery as part of photography-session promotions and giveaways, placing Angelic Ice branding over Mapes source material and generating numerous commercial-looking composites.

123. The page-level Vintage Halloween uses and Cinepage subscription solicitation further demonstrate that the direct infringement universe includes both informal group edits and commercial or audience-building uses.

124. The identities of many direct infringers remain uniquely or primarily within Meta’s records. Public display names alone do not establish the legal identity, service address, account registrant, uploader, or historical administrator responsible for a particular post. Plaintiff has therefore preserved and will seek the subscriber, uploader, and group-role records necessary to identify those persons accurately.

**HISTORICAL NOTICE AND INFRINGEMENT CHRONOLOGY - 2021 THROUGH 2024**

125. Mapes’s Facebook notice history did not begin in 2025. The reconstructed group-notice record reflects reports and communications beginning in 2021 and continuing through 2024 before the Angelic Ice episode and the September 2026 notice campaign.

126. For 2021, the reconstructed summary identifies 6 unique reports, 14 communications, and 231 reported URLs. The record includes repeated statements that material had previously been reported and that Facebook responses asserting removal did not match what Mapes could still access.

127. For 2022, the reconstructed summary identifies 10 unique reports, 46 communications, and 986 reported URLs. The report set includes large batches tied to the Santa Reading on Couch and Santa Snowglobe works and to Facebook editing groups.

128. For 2023, the reconstructed summary identifies 15 unique reports, 59 communications, and 1,537 reported URLs. November 2023 alone accounts for 12 report submissions, 50 communications, and approximately 1,130 URL occurrences in the summary.

129. For 2024, the reconstructed summary identifies 8 unique reports, 24 communications, and 618 reported URLs. The November 2024 summary includes one report associated with approximately 310 URL occurrences.

130. The earlier historical reconstruction identified 39 numbered copyright-report references and approximately 3,372 reported URL occurrences for the 2021–2024 period. A subsequent source-level reconciliation has matched 38 of those report references to recovered records, while one earlier report reference remains unresolved. The 3,372 figure reflects the earlier occurrence-based compilation and is not the sum of the recovered URL lists associated with the individually identified reports. The record includes repeated submissions, follow-up communications, and repeated references to the same accused material, which are relevant to the history of notice to Meta but are not alleged to establish an equivalent number of unique infringing Facebook posts or compensable uses.

131. The accompanying Historical Report Schedule distinguishes a numbered report from associated correspondence and reported-URL occurrences. The underlying report number, date, content list, and available Meta acknowledgment are the preferred identification fields. Where a source record does not establish a particular value, Plaintiff does not infer it from later quoted

correspondence or aggregate summary data (See Exhibit F). For the individual reports discussed below, the number of linked communications refers to recoverable correspondence associated with the particular report, and the reported-URL figure refers to the largest recovered attributable content list, rather than an allocation of aggregate annual reporting totals. Linked communications may overlap between reports, and the counts are not additive measures of unique communications.

**Representative Historical Report Schedule**

| Year-Month | Report No. | Linked Communications | Reported-URL Entries |
|---|---|---|---|
| 2021-12 | 220501123572933 | 2 | 1+ |
| 2021-12 | 340043124251708 | 3 | 1 |
| 2021-12 | 391886366022254 | 2 | 1+ |
| 2021-12 | 492392462190162 | 3 | 1+ |
| 2021-12 | 1317888405393609 | 4 | 1+ |
| 2021-12 | 5054037441283785 | 5 | 1+ |
| 2022-08 | 1026516974714471 | 2 | 1 |
| 2022-09 | 789739545579099 | 1 | 32 |
| 2022-10 | 1825081114491706 | 4 | 1 |
| 2022-11 | 402308315350583 | 2 | 6 |
| 2022-11 | 677387470413817 | 2 | 6 |
| 2022-11 | 694045005384238 | 4 | 11 |
| 2022-11 | 1325546304859969 | 2 | 8 |
| 2022-11 | 2294942684002260 | 2 | 1 |
| 2022-11 | 3426883744212054 | 2 | 1 |
| 2022-11 | 5501575306563815 | 4 | 1 |
| 2023-08 | 320441923739751 | 2 | 3 |
| 2023-11 | 362274136275647 | 2 | 117 |
| 2023-11 | 354945680519675 | 2 | 12 |
| 2023-11 | 368043442290897 | 2 | 1 |
| 2023-11 | 658455902831007 | 2 | 24 |
| 2023-11 | 667041138871175 | 2 | 28 |
| 2023-11 | 695398362560469 | 2 | 24 |
| 2023-11 | 706709631131799 | 2 | 1 |

| Year-Month | Report No. | Linked Communications | Reported-URL Entries |
|---|---|---|---|
| 2023-11 | 715822680147489 | 2 | 10 |
| 2023-11 | 718988406782528 | 6 | 5 |
| 2023-11 | 721278776169969 | 2 | 8 |
| 2023-11 | 1022934178978688 | 4 | 5 |
| 2023-11 | 1112732656387812 | 2 | 7 |
| 2023-11 | 1469674550264387 | 2 | 13 |
| 2024-08 | 3718790928435941 | 1 | 15 |
| 2024-08 | 8243264595711890 | 2 | 7 |
| 2024-11 | 886178666617395 | 2 | 25 |
| 2024-11 | 786151936935255 | 2 | 2 |
| 2024-11 | 1589411571669086 | 2 | 142 |
| 2024-11 | 1939889039827774 | 2 | 2 |
| 2024-11 | 1950300098767889 | 2 | 1 |
| 2024-12 | 854950316544512 | 2 | 15 |

**Report-by-Report Historical Detail**

132. The recovered historical record identifies Meta/Facebook Report No. 220501123572933, first evidenced in December 2021, with two linked communications. An attributable reported-content URL list has not been recovered for this report. The identified report and associated communications remain part of the documented history of copyright notices concerning Mapes's works.

133. The recovered historical record identifies Meta/Facebook Report No. 340043124251708, first evidenced in December 2021, with three linked communications. The recovered reported-content list associated with that report contains one URL entry. Plaintiff relies on this report as evidence of repeated communications with Meta, not as a separate infringement unless the report materials identify the copyrighted work and accused material.

134. The recovered historical record identifies Meta/Facebook Report No. 391886366022254, first evidenced in December 2021, with two linked communications. An

attributable reported-content URL list has not been recovered for this report. The report remains independently identified in the recovered correspondence.

135. The recovered historical record identifies Meta/Facebook Report No. 492392462190162, first evidenced in December 2021, with three linked communications. An attributable reported-content URL list has not been recovered for this report. The associated correspondence reflects additional reporting and follow-up activity concerning alleged infringement of Mapes's copyrighted works.

136. The recovered historical record identifies Meta/Facebook Report No. 1317888405393609, first evidenced in December 2021, with four linked communications. An attributable reported-content URL list has not been recovered for this report. The associated correspondence includes Meta's December 27, 2021 removal representation and Mapes's December 28, 2021 report that the accused BlackDoctor.org photograph remained accessible.

137. The recovered historical record identifies Meta/Facebook Report No. 5054037441283785, first evidenced in December 2021, with five linked communications. An attributable reported-content URL list has not been recovered for this report. The associated correspondence includes Meta's December 24, 2021 removal representation and Mapes's subsequent reports disputing complete removal of the accused BlackDoctor.org material.

138. The recovered historical record identifies Meta/Facebook Report No. 789739545579099 in September 2022. The largest recovered reported-content list associated with that report contains 32 URL entries, representing 31 distinct URL strings, and the current index links one Facebook communication to that report. The associated reporting records document a separate identified copyright-report matter and the material identified through that process. Plaintiff distinguishes the recovered source-level figures from the earlier historical reconstruction and does not treat repeated references to the same URL as separate infringements.

139. The recovered historical record identifies Meta/Facebook Report No. 1026516974714471, first evidenced in August 2022, with two linked communications. The largest recovered reported-content list contains one URL entry. The report provides a separately identifiable instance of copyright reporting and Meta's response during the continuing course of alleged infringement.

140. The recovered historical record identifies Meta/Facebook Report No. 1825081114491706, first evidenced in October 2022, with four linked communications. The largest recovered reported-content list contains one URL entry. The associated correspondence further documents the history of reporting, follow-up communications, and Meta's processing of identified copyright complaints.

141. The recovered historical record identifies Meta/Facebook Report No. 402308315350583, first evidenced in November 2022, with two linked communications. The largest recovered reported-content list contains six URL entries, representing five distinct URL strings. The report contributes to the documented pattern of repeated copyright complaints submitted to Meta.

142. The recovered historical record identifies Meta/Facebook Report No. 677387470413817, first evidenced in November 2022, with two linked communications. The largest recovered reported-content list contains six URL entries, representing five distinct URL strings. The associated reporting materials document additional allegedly infringing Facebook content identified through Meta's copyright-reporting process.

143. The recovered historical record identifies Meta/Facebook Report No. 694045005384238, first evidenced in November 2022, with four linked communications. The largest recovered reported-content list contains eleven URL entries, representing eight distinct URL strings. The report and associated correspondence provide a further identifiable record of alleged infringement reported to Meta.

144. The recovered historical record identifies Meta/Facebook Report No. 1325546304859969, first evidenced in November 2022, with two linked communications. The largest recovered reported-content list contains eight URL entries. The identified report provides an additional example of Mapes's use of Meta's reporting procedures to identify allegedly unauthorized Facebook content.

145. The recovered historical record identifies Meta/Facebook Report No. 2294942684002260, first evidenced in November 2022, with two linked communications. The largest recovered reported-content list contains one URL entry. This report is separately identifiable in the recovered record and forms part of the chronology of notices submitted concerning Mapes's copyrighted works.

146. The recovered historical record identifies Meta/Facebook Report No. 3426883744212054, first evidenced in November 2022, with two linked communications. The largest recovered reported-content list contains one URL entry. The associated records further demonstrate the continued submission and processing of individual copyright complaints during November 2022.

147. The recovered historical record identifies Meta/Facebook Report No. 5501575306563815, first evidenced in November 2022, with four linked communications. The largest recovered reported-content list contains one URL entry. The report and associated correspondence provide an additional documented instance of Mapes's continuing efforts to notify Meta concerning alleged infringement.

148. The recovered historical record identifies Meta/Facebook Report No. 362274136275647, first evidenced in November 2023, with two linked communications. The largest recovered reported-content list contains 117 URL entries, representing 100 distinct URL strings. This report documents a substantial collection of specifically identified accused Facebook URLs within a single reporting matter and illustrates the scope of the infringement concerns brought to Meta's attention.

149. The reconstructed historical record identifies Meta/Facebook report number 588780465975113 in 2023-02, with 2 communications associated with the report thread and approximately 6 reported URL occurrences in the summary. The preserved native report, response, and supporting URL material document the substance of the notice, Meta's response, and any separately preserved post-notice availability.

150. The recovered historical record identifies Meta/Facebook Report No. 320441923739751, first evidenced in August 2023, with two linked communications. The largest recovered reported-content list contains three URL entries. The report and associated communications reflect additional copyright-reporting activity during the period preceding the extensive November 2023 reporting campaign.

151. The recovered historical record identifies Meta/Facebook Report No. 354945680519675, first evidenced in November 2023, with two linked communications. The largest recovered reported-content list contains twelve URL entries. This report forms part of the concentrated sequence of November 2023 copyright complaints concerning unauthorized uses of Mapes's works.

152. The recovered historical record identifies Meta/Facebook Report No. 368043442290897, first evidenced in November 2023, with two linked communications. The largest recovered reported-content list contains one URL entry. This report constitutes an additional separately identified notice within the broader November 2023 reporting sequence.

153. The recovered historical record identifies Meta/Facebook Report No. 658455902831007, first evidenced in November 2023, with two linked communications. The largest recovered reported-content list contains 24 URL entries. This report documents another collection of specifically identified accused Facebook content included in Mapes's repeated copyright-reporting activity.

154. The recovered historical record identifies Meta/Facebook Report No. 667041138871175, first evidenced in November 2023, with two linked communications. The largest recovered reported-content list contains 28 URL entries. The report contributes to the evidence of numerous separately identified copyright complaints submitted during the same reporting period.

155. The recovered historical record identifies Meta/Facebook Report No. 695398362560469, first evidenced in November 2023, with two linked communications. The largest recovered reported-content list contains 24 URL entries. The recovered correspondence reflects an additional reporting matter within Mapes's continuing efforts to identify allegedly infringing Facebook material.

156. The recovered historical record identifies Meta/Facebook Report No. 706709631131799, first evidenced in November 2023, with two linked communications. The largest recovered reported-content list contains one URL entry. The report is separately identified in Meta's reporting records and contributes to the documented sequence of copyright notices during November 2023.

157. The recovered historical record identifies Meta/Facebook Report No. 715822680147489, first evidenced in November 2023, with two linked communications. The largest recovered reported-content list contains ten URL entries, representing eight distinct URL strings. The associated reporting materials document additional identified instances of allegedly infringing Facebook content.

158. The recovered historical record identifies Meta/Facebook Report No. 718988406782528, first evidenced in November 2023, with six linked communications. The largest recovered reported-content list contains five URL entries. The correspondence associated with this report extends into April 2025, demonstrating that the recovered history includes later communications linked to an earlier reporting matter.

159. The recovered historical record identifies Meta/Facebook Report No. 721278776169969, first evidenced in November 2023, with two linked communications. The largest recovered reported-content list contains eight URL entries. The report constitutes another independently identified copyright-reporting matter within the November 2023 notice sequence.

160. The recovered historical record identifies Meta/Facebook Report No. 1022934178978688, first evidenced in November 2023, with four linked communications. The largest recovered reported-content list contains five URL entries, representing four distinct URL strings. The associated correspondence reflects additional reporting and follow-up activity concerning specifically identified Facebook content.

161. The recovered historical record identifies Meta/Facebook Report No. 1112732656387812, first evidenced in November 2023, with two linked communications. The largest recovered reported-content list contains seven URL entries. The report provides a further separately identifiable record of alleged infringement submitted through Facebook's copyright-reporting procedures.

162. The recovered historical record identifies Meta/Facebook Report No. 1469674550264387, first evidenced in November 2023, with two linked communications. The largest recovered reported-content list contains thirteen URL entries. This report further illustrates the concentration of separately identified copyright complaints submitted during the November 2023 reporting period.

163. The recovered historical record identifies Meta/Facebook Report No. 886178666617395, first evidenced in November 2024, with two linked communications. The largest recovered reported-content list contains 25 URL entries, representing 21 distinct URL strings. The preserved portal evidence identifies both active and deleted content associated with the reporting record, although the recovered materials do not independently establish a subsequent Meta removal confirmation for this specific report.

164. The recovered historical record identifies Meta/Facebook Report No. 3718790928435941, first evidenced in August 2024, with one linked communication. The largest recovered reported-content list contains fifteen URL entries. The preserved portal records identify accused content and reflect the continued use of Facebook's copyright-reporting system during 2024.

165. The recovered historical record identifies Meta/Facebook Report No. 8243264595711890, first evidenced in August 2024, with two linked communications. The largest recovered reported-content list contains seven URL entries, representing four distinct URL strings. The report and associated correspondence provide an additional record of copyright complaints concerning Mapes's works.

166. The recovered historical record identifies Meta/Facebook Report No. 786151936935255, first evidenced in November 2024, with two linked communications. The largest recovered reported-content list contains two URL entries. The report is separately identified in the recovered November 2024 reporting records and contributes to the chronology of continuing complaints.

167. The recovered historical record identifies Meta/Facebook Report No. 1589411571669086, first evidenced in November 2024, with two linked communications. The largest recovered reported-content list contains 142 URL entries, representing 139 distinct URL strings. This report constitutes one of the larger individually documented reporting matters in the recovered 2024 record and demonstrates the substantial number of specifically identified accused Facebook URLs included in the reporting process.

168. The recovered historical record identifies Meta/Facebook Report No. 1939889039827774, first evidenced in November 2024, with two linked communications. The largest recovered reported-content list contains two URL entries. This report represents another separately identified instance of Mapes notifying Meta concerning alleged infringement during the November 2024 reporting period.

169. The recovered historical record identifies Meta/Facebook Report No. 1950300098767889, first evidenced in November 2024, with two linked communications. The largest recovered reported-content list contains one URL entry. The report and associated correspondence form part of the continued pattern of copyright notices submitted to Meta concerning unauthorized uses of Mapes's copyrighted works.

170. The recovered historical record identifies Meta/Facebook Report No. 854950316544512 in December 2024, with two linked Facebook communications and a recovered reported-content list containing 15 URL entries, representing 13 distinct URL strings. Meta's December 5, 2024 response stated that the reported content had been removed. The associated records are identified as FB0245, FB0247, and FB0248 in the recovered chronology.

171. Representative 2021 notices stated that Facebook had represented that identified content was removed, while Mapes contemporaneously observed that the same identified content remained accessible. Plaintiff alleges this sequence as notice of a removal-and-accessibility dispute concerning the identified material, not as an allegation that every removal representation was false.

172. The December 2021 BlackDoctor.org matter provides an early documented example of disputed removal. Mapes repeatedly advised Facebook that the reported photograph remained accessible after Facebook had issued removal responses. Her December 28 escalation identified reports 1317888405393609, 492392462190162, 340043124251708, and 5054037441283785 and characterized the communication as her sixth request for action.

173. Representative November 2023 notices identified VA0002151851 and stated that users obtained the copyrighted work through Facebook groups, redistributed it, shared it, and edited it without authorization. The notices repeatedly asked Meta to preserve records and disable groups used to facilitate the infringement.

174. A January 2024 report concerning VA0002151851 expressly identified a group and stated that multiple reports had already been made, that the group continued to infringe, and that

Facebook had been repeatedly notified. A December 4, 2024 notice again demanded preservation and closure of the groups and alleged significant harm to Mapes's business.

**THE MARCH–APRIL 2025 ANGELIC ICE / TANISHA LLOYD EPISODE**

175. On or about March 22, 2025, Mapes was alerted that Tanisha Lloyd, through Angelic Ice Photography, was using Mapes imagery, including images depicting minor children, in commercial photography promotions.

176. The preserved compilation states that Lloyd used Mapes works in edited composites, removed or obscured Mapes's watermark in numerous examples, placed Angelic Ice branding or watermarking on the resulting images, and used the images to advertise or book photography sessions.

177. Mapes contacted Lloyd directly on March 22 and demanded that the infringement stop. According to the preserved chronology, Lloyd attributed some activity to an administrator and other activity to website developers, made social-media accounts private, and stated that she would remove material.

178. Mapes alleges that the infringing material was not fully removed. She then began submitting Facebook copyright reports through Facebook's intellectual-property reporting system.

179. On March 23, 2025, Mapes submitted 17 copyright reports concerning Angelic Ice containing106 reported-URL entries. The preserved screenshots display multiple report numbers from that date.

180. Mapes states that after the 17 reports Facebook restricted her from filing additional reports and displayed a warning that her activity could be considered annoying or abusive and that further misuse of site features could result in a temporary block or permanent disabling of her account.

181. Mapes alleges that she still had many additional Angelic Ice URLs to report when the restriction occurred.

182. On March 23, 24, and 25, Mapes emailed multiple Facebook/Meta addresses, including ip@fb.com, press@fb.com, support@fb.com, and copyright@fb.com, and replied to existing copyright-case threads in an effort to deliver the remaining notices.

183. Those communications supplied infringing URLs and DMCA language and expressly advised Meta that Mapes was unable to use the ordinary reporting form.

184. Mapes also contacted an attorney who had represented Meta in an earlier copyright matter and attempted to route the evidence through that channel.

185. On or about March 25, Mapes opened a Meta support ticket under an advertising issue because, according to her chronology, she could not open an ordinary copyright-support ticket.

186. The support representative allegedly stated that he worked in advertising and could not transfer the copyright complaint to the appropriate team. After consulting supervisors, he allegedly returned Mapes to the ip@fb.com address and provided a telephone number that routed callers back to Meta's online help system rather than to a person who could accept the report.

187. Mapes then emailed ip@fb.com again. The automated response allegedly instructed her to use the online form, the same form she had just documented as unavailable to her.

188. On March 25, Mapes also sent certified letters to Meta/Facebook registered agents in Delaware and California. The preserved tracking evidence reflects delivery on March 26 and March 27, 2025.

189. The certified-mail tracking numbers preserved in the evidence are ER145589125US for the Delaware delivery and ER1145589134US for the Menlo Park delivery.

190. The Angelic Ice compilation states that Mapes's escalation included two support tickets, a direct phone call, more than eighteen email exchanges with Meta's legal team, direct contact with designated counsel, and the two certified letters, in addition to the 17 portal reports.

191. By April 8, Mapes states that the remaining notices had not been processed and that substantial accused content remained accessible.

192. On April 10, 2025, Meta acknowledged the legal demand and stated that content had been removed. Mapes responded the same day that not all reported links had been disabled, that her reporting access had not been restored, and that the repeat infringer still retained access to Facebook.

193. Mapes requested both restoration of her ability to submit copyright reports and disabling of the Angelic Ice account based on the alleged repeat infringement.

194. On April 14-15, Meta asked again for the links and for evidence of the reporting error. Mapes states that she again provided the relevant links and a screenshot of the block/error.

195. By April 15, Mapes's chronology states that the Angelic Ice package had been transmitted through 17 DMCA reports, 13 email transmissions, one direct communication to Meta counsel, two support tickets, and two certified-mail notices to Meta's registered agents.

196. Mapes also expressly warned that if her reporting access was not restored, if the links were not disabled, and if the repeat infringer was permitted to continue using Facebook after hundreds of alleged infringements, she would pursue Facebook directly.

197. On April 28, Meta again asked for links. Mapes states that she provided them again and made another final demand.

198. As reflected in Mapes's preserved May 2025 records, she continued identifying Angelic Ice Photography Facebook photographs that she believed remained accessible despite earlier copyright reporting and removal communications. A May 5, 2025 working URL compilation separately identified photographs that Mapes had reported and rechecked, together with additional accused URLs that she stated she had been unable to submit through the ordinary reporting mechanism after her reporting access was restricted.

199. Representative accused Angelic Ice photo identifiers appearing in the May 2025 continued-availability compilation include 2851946528255365, 2815949901855028, 2772110949572257, 2650244791758874, 3342287329221280, 3195370320579649, and 3128469270603088, associated with the Angelic Ice Photography Facebook page. The compilation

also separately identifies additional URLs that Mapes states she was unable to report through the restricted reporting mechanism. Plaintiff distinguishes those categories because an accused photograph identified in a working compilation was not necessarily the subject of a successfully submitted notice.

200. The record further includes a May 7, 2025 attorney demand addressing the continued infringement and Meta’s handling of the complaints, followed by a May 19, 2025 Meta response preserved in the correspondence record. The additional correspondence extended the prior notice and escalation chronology beyond the March–April reporting episode (See Exhibit G).

201. The Angelic Ice compilation alleges over 300 separate Facebook uses involving more than 80 Mapes images over the 2017-2025 period. Those figures are pleaded as the scope of the preserved Angelic Ice package and will be tied to individual URLs and works through the evidence schedule and exhibits.

202. Exhibit J contains representative source-to-accused comparisons showing Mapes's original works bearing copyright-management information identifying Mapes as the author or copyright owner, including “© Tara Mapes,” “Tara Mapes,” taramapes.com, or substantially similar identifying information alongside accused Angelic Ice copies in which that information is absent, obscured, or replaced with Angelic Ice branding. Exhibit J-1 separately identifies additional accused Facebook content locations by work or source-title grouping. The visual comparisons and identifier schedule are evidentiary aids rather than an allegation that every comparison or listed identifier, standing alone, establishes a separate violation by Meta of 17 U.S.C. Section 1202(b)(3).

203. Representative examples demonstrate the same pattern across numerous distinct Mapes works. For example, the authorized Santa Reading Book on Couch source visibly bears Mapes's identifying information, while the accused Angelic Ice Facebook composite omits that marking and displays Angelic Ice branding. The same visual substitution appears in preserved dinosaur, bear, mermaid, unicorn, lion, tiger, dragon, Santa, fantasy, and forest works.

204. On March 24, 2025, Mapes expressly notified Meta at ip@fb.com that specifically identified Angelic Ice Facebook images not only infringed her copyrighted works but had removed her watermark in violation of 17 U.S.C. § 1202. One such notice identified Mapes's Bear in Forest Looking Down work and the accused Facebook photograph bearing content identifier 1155015282862600. The preserved comparison shows visible Mapes authorship or ownership information on the authorized source and Angelic Ice branding on the accused version.

205. The same March 24 notice sequence identified an additional accused Facebook location bearing content identifier 976623264035137 and again expressly advised Meta that the infringer had removed Mapes's watermark in violation of § 1202. Meta subsequently processed that notice sequence and, on April 1, 2025, confirmed removal of the material associated with that identifier.

206. Mapes separately notified Meta on March 24, 2025 concerning Bear in Foggy Forest and identified the accused Facebook photograph bearing content identifier 1121642829533179. That notice likewise expressly stated that the infringer had removed Mapes's watermark in violation of § 1202. The corresponding side-by-side comparison shows Mapes's visible authorship or ownership information on the authorized source, its absence from the accused version, and Angelic Ice branding on the accused composite. Meta's April 1 response stated that the identified location appeared already removed.

207. On March 25, 2025, Mapes supplied Meta's ip@fb.com address with a broader work-by-work Angelic Ice package containing authorized source links and numerous accused Facebook URLs. The accompanying Angelic Ice materials described the removal of Mapes's watermark and the placement of Angelic Ice branding on Mapes imagery. Thus, Meta's notice was not limited to generalized allegations that Angelic Ice was infringing Mapes's copyrights; Meta received source-to-accused comparisons and express allegations concerning the removal and replacement of Mapes's authorship and ownership information.

208. For purposes of the § 1202(b)(3) claim against Meta, the Bear in Forest Looking Down and Bear in Foggy Forest notice sequences provide particularly specific examples because those notices expressly identified the removed CMI, the affected works, and the accused Facebook locations, and because Mapes subsequently confirmed continued availability of the same identified material. The claim is not limited, however, to those two examples. Meta also received the broader work-by-work Angelic Ice package identifying authorized source materials, accused Facebook locations, and the removal or replacement of Mapes's authorship and ownership information across numerous works. Upon information and belief, after receiving that package, Meta continued transmitting at least some of the specifically identified altered copies through Facebook. Meta knew that Mapes alleged those copies had been stripped of her attribution and rebranded as Angelic Ice material and knew, or had reasonable grounds to know, that continued distribution of those copies would conceal Mapes's authorship and facilitate continued unauthorized reproduction, display, distribution, and commercial exploitation. Meta's content, notice, file-version, access, delivery, impression, and removal records will confirm the additional identified post-notice transmissions.

209. After Meta received the March 24, 2025 CMI-specific notices, the same accused Facebook photographs identified in those notices remained accessible through Facebook on May 2, 2025. The Bear in Forest Looking Down notice identified Facebook content identifier 1155015282862600, and the May 2 verification identifies that same content identifier as accessible. The Bear in Foggy Forest notice identified Facebook content identifier 1121642829533179, and the May 2 verification likewise identifies that same content identifier as accessible. Mapes's October 17, 2026 email identifies the underlying March notice records as Records A and B and the May 2 verification as Record C. Upon information and belief, during the period after Meta received the notices and before those identified altered copies were actually disabled, users accessed the photographs and Meta's content-delivery infrastructure transmitted the accused image files for display. This inference rests on the identical content identifiers, the March notices, the May 2 verification, and Meta's documented ability to process identified photograph URLs. Plaintiff believes Meta's delivery, impression, version, and removal records will confirm the dates, recipients, and number of post-notice transmissions (See Exs. G and J.)

**Representative Angelic Ice Direct-Infringement Evidence**

210. Exhibit J contains 50 representative source-to-accused comparisons showing Mapes's original watermarked works alongside accused Angelic Ice composites in which Mapes's copyright-management information is absent, obscured, or replaced with Angelic Ice branding. Schedule J-1 separately catalogs the identified Angelic Ice Facebook content identifiers by Mapes work, including 49 content identifiers associated with Dog Heaven.

211. The same package includes "Funny Bunny," fairy/book, giraffe, mermaid, Christmas window, lion, unicorn, dinosaur, Santa workshop, wizard, fox, panda, and other works, with original Mapes source images, accused Angelic Ice composites, and corresponding Facebook URLs.

212. The package includes multiple accused images bearing "Angelic Ice Fantasy & Styled Photography" or similar Angelic Ice branding over a Mapes background. Those examples support direct reproduction and derivative-work allegations and, where the required scienter and CMI facts can be proven, a separate 17 U.S.C. § 1202 analysis against the direct infringer.

213. The package also preserves commercial uses. One example shows an Angelic Ice Christmas Fantasy Mini Session giveaway requesting users to invite friends, tag people, and share the post. Other preserved material describes booking paid sessions using edited composites built on Mapes imagery.

214. The Angelic Ice evidence therefore provides a concrete predicate-infringement package: identified original works; identified accused composites; identified Facebook URLs; identifiable account/page ownership; repeated use; commercial promotion; and post-notice continuation.

**SEPTEMBER 2026 DIRECT META NOTICE CAMPAIGN**

215. In late September 2026, Mapes renewed direct notice to Meta through email because she states that the ordinary online reporting tools remained unavailable, blocked, or nonfunctional for her account.

216. The preserved September 29-30 record reflects 103 outgoing emails from Mapes to Meta: 50 substantive DMCA notices, two registration-correction replies, three additional processing or form-referral replies, and 48 follow-up emails. The substantive notices and follow-ups contain 350 reported, quoted, or renewed URL occurrences, with repeat reporting retained. The same two-day record preserves 51 Meta responses and 92 automated delivery-failure messages.

217. The substantive notices repeatedly stated that Meta's online reporting mechanisms were failing, blocked, or unable successfully to accept the reports.

218. Meta's responses nevertheless directed Mapes back to the online reporting mechanisms, and attempted replies to certain case-specific addresses generated no-reply or delivery-failure responses. Plaintiff does not allege that every delivery failure establishes nonreceipt by Meta's designated copyright channel.

219. Representative September 2026 correspondence is preserved in Exhibit H. On September 27, 2026, Mapes sent separate notices concerning the Quick Clever Tips / Creative Tutorials and Weirdo History Facts uses of a registered Horror Halloween photograph. On September 29, 2026, she sent notice concerning the Santa with Magic Snow Globe infringement associated with Facebook Group ID 1691407778345208. The preserved correspondence reflects Meta responses referring Mapes back to its online reporting forms notwithstanding her statements that those mechanisms were not accepting or processing her submissions. Subsequent correspondence repeated the request that Meta review the specifically identified infringement.

220. On October 29, 2026, Plaintiff submitted additional work-specific copyright notices to Meta's designated agent concerning unauthorized Facebook uses of her registered Horror Halloween photographs, including uses in a large Facebook group and on a promotional page. The notices identified the copyrighted works and corresponding accused Facebook locations and again explained that Plaintiff was unable to complete submission through Meta's designated online reporting mechanisms. Meta responded in multiple corresponding communications that the reports

would not be reviewed unless submitted through those forms. Plaintiff reiterated the reported failures and renewed her requests for review, including through correspondence addressed to Meta's designated agent.

221. The preserved correspondence also identifies an instance in which Meta processed a copyright notice submitted during the same direct-notice campaign while directing other identified notices back to the online reporting mechanism, demonstrating that Meta was capable of processing at least some directly submitted material notwithstanding its form-only responses to other submissions.

222. The late-September notices also provide a highly specific work-and-URL record, including Santa Globe, Vintage Halloween, Jesus Globe, Faceless Dolls, and other works and identifying particular pages, groups, and user accounts.

**META’S SPECIFIC KNOWLEDGE OF IDENTIFIED INFRINGEMENT**

223. Meta had actual knowledge of specifically identified alleged infringements through portal reports, direct email notices, certified letters, support tickets, attorney correspondence, screenshots, original-work links, accused URLs, report numbers, and case-response threads.

224. Upon information and belief, Meta maintains records connecting reported URLs and content identifiers to responsible accounts, pages, groups, administrators, prior copyright complaints, report or case identifiers, removals, restorations, restrictions, subsequent activity, and related enforcement actions. This inference is supported by Meta’s assignment of individual report and case identifiers, its content-specific responses, its documented ability to act upon identified material, and its account- and group-level enforcement authority. Those records are expected to identify whether a reported account, page, group, or administrator had previously been reported; the copyright complaints associated with it; whether complaints resulted in strikes, warnings, restrictions, removals, restorations, rescissions, termination, or other enforcement; and whether the account continued engaging in substantially similar conduct. Mapes repeatedly supplied Meta with particular URLs,

account information, group information, and allegations of prior substantially similar infringement. Meta therefore possessed the right and practical ability to supervise the identified accounts, groups, pages, posts, and distribution functions through which the alleged repeat activity occurred.

225. Upon information and belief, Meta maintains internal records associating the identified infringing Facebook posts, photographs, comments, and derivative uploads with the accounts responsible for those actions, including account identifiers, content identifiers, upload timestamps, group identifiers, and related activity records. Plaintiff bases this allegation on the account-specific and content-specific information publicly displayed through Facebook and the platform's demonstrated ability to associate individual content with particular users and groups. These records will permit identification of the persons responsible for the individual acts of unauthorized reproduction, preparation of derivative works, and redistribution described herein, including instances in which the publicly displayed account name does not establish the responsible person's legal identity.

226. The reconstructed 2021–2024 historical subset reflects 39 report submissions, 143 communications, and 3,372 reported-URL occurrences concerning alleged infringement of Mapes's works through Facebook. The broader recovered record extends from October 2020 through September 30, 2026 and identifies 153 distinct numbered infringement reports, additional direct communications, and more than 4,200 reported-URL occurrences. These figures measure different aspects of the notice record and are not alleged to represent unique infringements, unique works, or damages units.

227. The March 2025 Angelic Ice episode added 17 portal reports in one day and repeated alternative delivery of an approximately 344-use package after Mapes says the reporting mechanism stopped accepting further reports.

228. The late-September 2026 campaign added 53 unique direct notices identifying 145 distinct Facebook URLs and expressly documenting the inability to use Meta's ordinary reporting mechanisms.

229. Meta's own communications and reporting-system records establish receipt or processing of at least portions of Mapes's copyright-reporting activity. The preserved record includes numbered copyright reports, Meta responses and removal representations, subsequent owner communications disputing complete removal, and later correspondence directing Mapes to reporting mechanisms she stated were not functioning. Representative examples are preserved in Exhibits F, G, H, and M.

230. Plaintiff therefore does not rely on constructive knowledge based on general awareness that infringement exists somewhere on Facebook. The knowledge allegations concern specific works, specific URLs, specific pages/groups/accounts, and specific repeated reporting episodes.

**META'S REPORTING AND ENFORCEMENT CONDUCT**

231. Plaintiff alleges affirmative conduct in the operation of Meta's reporting and enforcement systems, separate from the mere fact that Meta did not terminate every accused user.

232. After Mapes submitted 17 Angelic Ice reports on March 23, 2025, Meta's system displayed a warning that her activity could be considered abusive and that further misuse of site features could result in temporary blocking or permanent account disabling. Mapes states that this restriction prevented submission of additional copyright reports.

233. Mapes then attempted multiple alternative channels. A support representative allegedly stated that the advertising support team could not transfer the matter to the copyright team. Meta's automated email response then directed Mapes back to the online form that Mapes had told Meta she could not use.

234. Mapes escalated by certified mail, email, attorney contact, and telephone support. Meta later stated that content had been removed, while Mapes contemporaneously responded that specific content remained accessible and that her reporting access remained restricted.

235. Meta's communications demonstrate receipt and processing of at least some specifically identified infringement reports. In September 2026, Mapes sent 53 direct notices identifying 145 accused Facebook URLs after she alleges that Meta's online reporting mechanisms would not accept or process her reports. Meta's case-specific responses directed Mapes to submit the reports through the online forms and stated that emailed reports would not be reviewed unless submitted through those forms. Of the 53 direct notices, 50 were substantive notices sent on September 29 and September 30, 2026; the remaining communications were corrections, replies, or follow-ups. Plaintiff distinguishes notices for which receipt or processing is documented from communications for which the record establishes only transmission or an automated response.

236. Plaintiff pleads this closed-loop conduct as relevant to actual knowledge, state of mind, the reasonableness of Meta's implementation of its repeat-infringer and notice systems, and willfulness with respect to any independently actionable Meta conduct continuing after notice.

237. Plaintiff does not allege that reporting obstruction, standing alone, establishes contributory infringement after Cox. The Cox intent element is addressed separately below.

## META'S TREATMENT OF SPECIFICALLY IDENTIFIED REPEAT INFRINGEMENT

238. Mapes repeatedly notified Meta of unauthorized uses of her registered works by specifically identified Facebook accounts, pages, and groups. Her notices identified protected works, accused Facebook URLs, responsible accounts where ascertainable, and instances of recurring infringement. The preserved record includes instances in which Mapes alleges that infringement associated with previously reported users or accounts continued after earlier notices and enforcement communications.

239. The Angelic Ice Photography matter provides a developed example. As alleged above, Mapes submitted seventeen copyright reports concerning Angelic Ice Photography and Tanisha Lloyd, thereafter continued supplying infringement information through alternative channels after her reporting access was restricted, and subsequently advised Meta that accused material remained accessible after Meta represented that identified content had been removed.

240. This history is relevant to the distinction drawn in *Cox Communications, Inc. v. Sony Music Entertainment*. Mapes does not allege that knowledge of repeat infringement, continued provision of Facebook service, or inadequate enforcement alone establishes contributory liability. Rather, the account-specific history bears upon the knowledge and intent with which Meta allegedly undertook the affirmative content-selection, recommendation, notification, distribution, and promotion acts alleged below.

241. Mapes alleges that those affirmative acts must be evaluated in light of the particular works, posts, accounts, notice dates, prior enforcement history, and subsequent direct infringements associated with the identified activity. The same account-specific evidence bears separately on whether Meta reasonably implemented its repeat-infringer policy for purposes of 17 U.S.C. § 512(i).

**DMCA SAFE-HARBOR AND REPEAT-INFRINGER FACTS**

242. Mapes repeatedly supplied Meta with work-specific, URL-specific, account-specific, page-specific, and group-specific information concerning alleged repeat infringement. That record includes the historical reports summarized in Exhibit F; the March–May 2025 Angelic Ice notices, reporting restriction, and follow-up in Exhibit G; the later direct notices and Meta form-referral responses in Exhibit H; repeat-participant and cross-distribution evidence in Exhibit I; and notice-to-continued-availability comparisons in Exhibit M. Mapes also requested that Meta evaluate the history of alleged infringement associated with identified accounts and editing groups rather than treating each reported photograph in isolation. Certain identified editing groups appeared repeatedly across

years of infringement reporting while the groups continued operating and users continued using Mapes's works as source material for new derivative edits.

243. Upon information and belief, Meta did not reasonably implement its repeat-infringer policy in appropriate circumstances as to at least some specifically identified subscribers and account holders described in the Complaint. This allegation is based on the repeated notices concerning the same accounts and works, the observed continuation or recurrence of accused activity, the reported restriction on Mapes's ability to submit additional notices, and Meta's later refusal to review direct written notices unless resubmitted through forms that Mapes stated were not functioning. Plaintiff believes Meta's strikes, account-status, termination, escalation, and policy-application records will confirm the manner in which those repeat histories were treated.

244. The reporting-form allegations are relevant because they bear on actual receipt, expeditious response, and reasonable implementation. Plaintiff does not allege that Section 512 required Meta to offer a particular proprietary form. Plaintiff alleges that Meta received sufficiently specific written information through multiple channels, restricted or failed to process further portal reporting, and later directed Mapes back to the same allegedly nonfunctioning route while the identified infringement continued.

245. Under 17 U.S.C. Section 512(l), the loss of a safe harbor does not adversely determine whether Meta's conduct is otherwise infringing. Plaintiff accordingly relies on the foregoing facts to defeat any asserted limitation on liability, while relying on the specific inducement, control, direct-financial-benefit, and Section 1202 allegations to establish liability.

246. A repeat-infringer policy cannot be evaluated in the abstract without examining what information the service provider actually maintained concerning recurring users and whether repeated known activity was meaningfully associated with those users in the provider's enforcement process.

247. Upon information and belief, Meta possesses records showing whether each reported account, group, administrator, or page had previously been reported; how many copyright complaints

were associated with it; whether those complaints resulted in strikes or other enforcement; whether content was removed and later restored; whether the account was warned or restricted; whether any strike was later rescinded; and whether the account continued engaging in substantially similar conduct.

248. Those records are exclusively within Meta's possession and will permit the Court to evaluate how Meta's repeat-infringer policy was actually implemented with respect to the specific repeat conduct alleged herein.

249. In 2026, Mapes also located additional groups and possible spin-off or parallel communities employing substantially the same workflow: a photograph or digital-art template is posted to a large membership, other users download or copy the source material, numerous unauthorized derivatives are generated, and those derivatives are then displayed and redistributed through Facebook.

250. Mapes further alleges that Meta's handling of individual removals must be examined in light of any restoration or continued availability of the reported material.

251. Where Meta advised Mapes that identified material had been removed but the same material remained accessible or was later restored, Meta's internal records will identify what occurred, why the content remained or returned, who made the restoration decision, and whether the relevant infringement was counted for purposes of Meta's repeat-infringer procedures.

252. Meta's practical ability to remove or disable access to particular Facebook content is relevant to the supervisory-control allegations pleaded above, but Plaintiff does not allege that this ability alone establishes the separate control requirement applicable to a limitation on liability asserted under 17 U.S.C. § 512(c).

253. If Meta invokes § 512(c), the statutory inquiry should be evaluated against the specific conduct alleged herein, including Meta's content distribution, group administration, copyright-

enforcement systems, reporting restrictions, recommendation and notification systems, advertising systems, repeat-infringer enforcement, and other pleaded involvement with the identified activity.

254. The financial-benefit allegations likewise remain analytically distinct. Mapes alleges elsewhere that specific infringement generated direct financial benefit to Meta through user activity causally attributable to infringing posts and groups. Whether those facts additionally affect a particular § 512 limitation will be determined under the applicable statutory standard.

255. Plaintiff does not seek liability merely because a statutory limitation may be unavailable. Direct and secondary liability remain independently pleaded and must independently be established.

**NOTICE AND POST-NOTICE CONDUCT**

256. The notices and correspondence described above establish that Mapes repeatedly supplied Meta with information identifying specific copyrighted works, accused Facebook locations, and the accounts, pages, or groups associated with those uses. The March 2025 Angelic Ice notice sequence and September 2026 direct-notice campaign provide particularized examples of those communications.

257. Meta's responses included acknowledgments of particular infringement reports, representations that identified material had been removed or was already unavailable, requests for additional information, and instructions to use reporting mechanisms that Mapes had identified as inaccessible or nonfunctional. The associated records are described in the preceding allegations and preserved in the accompanying exhibits.

258. Mapes alleges that identified unauthorized uses remained accessible or recurred following certain notices, as more specifically reflected in the preserved post-notice evidence. Plaintiff relies upon that evidence to establish the timing and specificity of Meta's knowledge and its handling of the identified content. Plaintiff does not allege that notice followed by non-removal,

standing alone, establishes contributory infringement, willfulness, or another independent violation of the Copyright Act.

259. Plaintiff alleges willfulness only as to conduct for which the applicable substantive claim and requisite state of mind are independently established, including through Meta's actions after receiving particularized information concerning identified copyrighted works and accused uses.

## WILLFULNESS, KNOWLEDGE, REPORTING INTERFERENCE, AND POST-NOTICE CONDUCT

260. The allegations concerning knowledge, intent, and willfulness differ among the direct infringers and Meta and are alleged separately as to the conduct attributable to each.

261. Mapes does not allege that every Facebook user who reproduced one of her works necessarily acted willfully merely because Meta separately possessed notice of infringement.

262. As to individual direct infringers, facts supporting willfulness include, where applicable, repeated exploitation of Mapes's works after direct notice; commercial use of Mapes's imagery; removal, alteration, or replacement of Mapes's identifying information or copyright-management information; repeated use of multiple Mapes works; continued infringement after cease-and-desist communications; re-uploading or redistribution after prior removals; and continued use after the same user had previously been identified in copyright complaints.

263. Meta's knowledge and state of mind are supported by a materially different and substantially larger record.

264. Over a period of years, Mapes repeatedly supplied Meta with information identifying her copyrighted works and the Facebook locations at which those works were being infringed. Her notices identified specific URLs, content identifiers, Facebook groups, commercial pages, accounts, repeat users, and examples in which one unauthorized source upload generated multiple additional reproductions and derivative edits. (See Exs. F–J and M.)

265. By March 2025, Meta's knowledge had become particularly specific concerning infringement associated with Angelic Ice Photography and Tanisha Lloyd. Mapes alleges that Lloyd and Angelic Ice reproduced, distributed, and publicly displayed Mapes's protected works hundreds of times from 2017 through 2025, including commercial uses in connection with photography services.

266. On March 23, 2025, Mapes submitted 17 copyright reports containing 106 reported URL entries identifying accused Angelic Ice activity. After those submissions, Facebook warned Mapes that further activity could result in a temporary block or the permanent disabling of her Facebook account and prevented her from submitting additional reports through the ordinary reporting system, even though additional alleged infringements remained to be reported. The restriction materially impaired the principal mechanism through which Mapes had been providing Meta with specific notice concerning an already-identified repeat commercial infringer. (See Ex. G.)

267. Mapes continued attempting to notify Meta through alternative channels. She opened two support tickets on March 23, contacted Facebook by telephone, communicated repeatedly by email, contacted Meta's designated attorney, and sent certified written notices to Meta-related addresses. Her records reflect delivery of certified notices in Menlo Park, California, on March 26 and in Wilmington, Delaware, on March 27, 2025. These communications identified the rights holder, accused commercial infringer, copyrighted works, Facebook locations, scope of the alleged copying, and failure of the ordinary reporting process. (See Ex. G.)

268. On March 24, 2025, Mapes sent Meta written notices identifying unauthorized Facebook uses of her Bear in Forest Looking Down and Bear in Foggy Forest works, including Facebook content identifiers 1155015282862600 and 1121642829533179. The notices expressly informed Meta that Mapes's copyright-management information had been removed and cited 17 U.S.C. § 1202. The same identified works and Facebook locations are depicted in the representative CMI comparisons attached as Exhibit J. (See Exs. G and J.)

269. Based on Mapes's contemporaneous April 15 inspection of identified links, her repeated delivery of those links to Meta, Meta's representations concerning removal, and Meta's subsequent acknowledgment that it had received and acted upon identified links, Plaintiff alleges that Meta possessed actual knowledge of specifically identified accused content and of Mapes's contention that identified content remained accessible after earlier notices. Plaintiff further alleges, upon information and belief, that Meta continued to host and make at least some specifically identified accused material accessible after receiving notice sufficient to locate it. Meta's content-status, access, transmission, impression, and delivery records are expected to confirm the duration and extent of each identified item's post-notice availability and delivery.

270. On April 15, 2025, Mapes advised Meta that identified links remained accessible, supplied evidence that Facebook's copyright-reporting mechanism was preventing her from submitting additional reports, and stated that she had supplied approximately 344 links through portal reports, emails, support tickets, correspondence with Meta's counsel, and certified mail. Mapes attached the link materials again with her April 15 communication. (See Exs. G and M.)

271. On April 23, 2025, Meta stated that it had removed additional content on April 10. On April 28, Meta stated that it could not locate the links transmitted with Mapes's April 15 email and asked her to paste the links into the body of another email. Mapes responded that same day that the links had already been supplied through the April 15 attachment, certified mail, prior emails, and support tickets. (See Exs. G and M.)

272. The preserved record also includes a May 7, 2025 attorney demand addressing the Angelic Ice infringement, Meta's restriction of Mapes's reporting access, and infringement occurring through Facebook editing groups. On May 19, 2025, Meta acknowledged receipt of the demand and accompanying links, stated that it had removed the identified content, and advised that further communications would be directed through counsel. (See Ex. G.)

273. By May 2025, Meta had not merely received a generalized complaint that infringement existed somewhere on Facebook. Meta had been supplied repeatedly with the identity of the rights holder, the accused commercial infringer, the copyrighted works, specific Facebook URLs and content identifiers, the alleged removal or alteration of copyright-management information, the asserted scale of the infringement, evidence of the reporting restriction, and Mapes's contention that identified material remained accessible after she had notified Meta.

274. The notice history continued after the Angelic Ice correspondence. Between November 2025 and January 2026, Mapes repeatedly notified Meta of alleged infringement of her registered Faceless Dolls series, Registration No. VA0002467149, including through reports 856300323643447, 1311338261037819, and 1835782817029523. After Meta rejected reported content as appearing "different," Mapes supplied side-by-side comparisons and informed Meta of the related proceeding, Mapes v. Yang, CCB Case No. 25-CCB-0505. Mapes subsequently advised Meta that the challenged content remained available.

275. In December 2025, Mapes also repeatedly notified Meta of unauthorized reproductions of her Santa with Magic Snow Globe work through reports 749143804199742, 794711056935070, and 697352476551094. Mapes advised Meta on December 16 that material identified in report 697352476551094 remained accessible. The preserved record reflects subsequent Meta removal responses on December 19 and December 22, 2025. (See Exhibit M.)

276. In September 2026, after identifying extensive additional Facebook infringement, Mapes again encountered problems using Meta's copyright-reporting mechanisms. Mapes's preserved notice index identifies 53 unique direct notices to Meta concerning 145 distinct Facebook infringement URLs. The notices stated that Meta's online reporting mechanism was not functioning, was preventing successful submission, or was otherwise failing to process the reports. Exhibit H preserves representative notices and Meta responses from September 27 through September 30, 2026. (See Exhibits F and H.)

277. During the same period, the underlying infringement continued and multiplied. Mapes identified additional editing groups, additional repeat users, additional Facebook URLs, and additional instances in which a single unauthorized source image generated multiple derivative edits and redistributions. The evidence also includes instances in which material circulated from editing groups to public-facing pages or accounts and instances involving repeated reporting of the same commercial use. (See Exhibit I.)

278. Based on the foregoing communications and evidence, Plaintiff alleges that Meta possessed actual knowledge of specifically identified claimed infringement, including knowledge of the works, accused uses, Facebook URLs, content identifiers, groups, accounts, commercial pages, repeat users, alleged removal or alteration of CMI, and asserted post-notice availability described above. Meta also knew that Mapes was attempting to provide additional specific notices after access to the ordinary reporting process had been restricted or had ceased functioning.

279. For the identified posts, groups, accounts, and copying chains described in this Complaint, Plaintiff alleges upon information and belief that, after Meta received specific notices identifying Mapes's works and accused Facebook locations, Meta affirmatively ranked, recommended, resurfaced, delivered through Feed, or sent notifications concerning identified accused material or derivative-edit threads. This allegation is based in part on the preserved post-notice accessibility evidence, the repeated identification of the same works and Facebook locations, Meta's control and operation of the relevant content-delivery systems, and the platform activity and reach evidence identified in the exhibits. Plaintiff believes Meta's internal event and delivery records will confirm the corresponding post-notice system activity. (See Exhibits G, I, L, and M.)

280. Plaintiff does not rely upon notice or reporting obstruction alone to establish inducement or any other form of secondary liability. Plaintiff relies upon the specific acts of direct infringement by Facebook users alleged in this Complaint and Meta's own affirmative post-notice

conduct, including the specific content-processing, distribution, recommendation, engagement, advertising, monetization, and account or group operations alleged in the preceding sections.

281. Plaintiff alleges that Meta's post-notice reproduction, processing, transmission, delivery, display, recommendation, or monetization of specifically identified accused material was knowing.

**META'S AFFIRMATIVE PROMOTION, DISTRIBUTION, AND FACILITATION OF META'S PLATFORM FUNCTIONS AND IDENTIFIED INFRINGEMENT**

282. In *Cox Communications, Inc. v. Sony Music Entertainment*, the Supreme Court held that a service provider is not contributorily liable merely because it knows customers are infringing and continues to provide an ordinary service capable of substantial lawful use. The required intent must be supported by affirmative inducement, encouragement, or a service tailored to infringement.

283. *Eight Mile Style, LLC v. Meta Platforms, Inc.*, No. 2:25-cv-11618 (E.D. Mich. June 16, 2026), illustrates the pleading risk. There, the court found allegations that Meta provided neutral platform tools and knew they could be used to infringe insufficient to plead contributory liability, while allowing a separately pleaded direct-infringement theory concerning Meta's own alleged storage/reproduction to proceed.

284. The contributory-infringement claim alleged herein does not rest merely upon Meta's knowledge that some Facebook users might use Facebook to infringe copyrights, nor merely upon Meta's failure to remove infringing material or terminate repeat infringers.

285. Rather, after Meta obtained specific and repeated notice identifying Mapes's copyrighted works, the Facebook groups in which those works were being reproduced, the individual Facebook URLs displaying unauthorized copies and derivatives, and in numerous instances the particular accounts engaged in the conduct, Meta continued, upon information and belief, to take affirmative acts that promoted, distributed, amplified, and facilitated the same identified infringing activity.

286. The infringement alleged herein occurred through identifiable Facebook accounts, pages, posts, and editing groups. The accused editing groups enabled participants to upload photographs and digital backgrounds as source material, request edits, create derivative composites, post completed images, and redistribute those images through Facebook posts, comments, and replies.

287. One representative example concerns Free Photo Edits ORIGINAL, Facebook Group ID 1062897731479032, in which a source posting of Santa with Magic Snow Globe, Registration No. VA0002151851, generated approximately 30 unauthorized edited responses. A separate source posting in Free Photoshop Requests: Photo Edits, Fixes & Restorations, Facebook Group ID 1691407778345208, generated approximately 15 edited responses. The identified source posts and derivative-image chains are described in the preceding allegations and reflected in the accompanying exhibits.

288. Mapes submitted notices identifying the underlying copyrighted works, particular Facebook locations, and the recurring process by which unauthorized source uploads resulted in additional copies and derivative images. Certain notices expressly requested that Meta consider the identified groups' prior infringement history and the involvement of repeat participants rather than evaluate each reported URL in isolation.

289. Meta operates the Facebook infrastructure through which users upload, host, retrieve, comment upon, share, and access the identified content. Meta also controls whether identified content remains available, whether accounts and groups remain operational, and whether particular content is eligible for distribution through Facebook's various content-delivery functions.

290. Meta publicly describes functionality through which content from public Facebook groups may appear in users' Facebook Feeds and elsewhere on Facebook. The existence of that functionality establishes Meta's technical capability to distribute group content beyond the initial upload location. Plaintiff does not infer from that general capability alone that a particular accused

image was recommended, ranked, resurfaced, or distributed to a particular user after Meta received a copyright notice.

291. The preserved evidence further includes at least one accused derivative image bearing a Meta AI identifier. Plaintiff alleges the existence of that identifier and the associated accused image but does not infer from the identifier alone the precise Meta product used, the identity of the person who initiated processing, the input supplied, or whether the processing occurred after Meta received notice of the underlying infringement.

292. The notices, the identified direct infringements, the continued availability evidence, and Meta's control over the relevant Facebook services are pleaded as facts concerning Meta's knowledge, the operation of the instrumentalities used in the infringement, and the scope of its supervisory authority. Plaintiff separately addresses below the additional elements necessary to establish any particular theory of secondary liability.

293. Mapes's notices did not merely advise Meta generally that "copyright infringement exists on Facebook." The notices identified specific registered works, specific infringing URLs, specific Facebook groups, specific posts, specific repeat users, and, in many instances, the manner in which a single unauthorized upload of a Mapes work was being multiplied into numerous additional reproductions and derivative works.

294. For example, Mapes documented a source-template post within Free Photo Edits ORIGINAL, a Facebook editing group with over 580,000 members, that generated approximately 30 separate derivative edits from a single unauthorized upload. Mapes specifically reported that infringement and supplied the URLs and evidence to Meta.

295. Mapes separately documented a single source post in another editing group with approximately 81,000 members that generated approximately 15 additional edits, and her September 2026 review identified approximately 44 additional infringement/post URLs within six newly identified editing groups.

296. By September 2026, Mapes had identified eighteen editing groups with approximately 2.995 million aggregate memberships, in addition to repeated individual accounts and posts using her works. Her evidence showed that these groups were not merely locations where isolated images happened to appear; their activity centered in substantial part on obtaining photographs and digital backgrounds, inviting users to edit them, producing derivative images, and redistributing the results to other members.

297. Mapes expressly informed Meta of this multiplication process. Her notices repeatedly advised Meta that the identified editing groups facilitated the posting of photographs and digital backgrounds for members to "download, edit, reproduce, and redistribute," and that one unauthorized source upload could generate numerous additional copies and uses.

298. Mapes also identified repeat infringers who obtained her works through one Facebook group, redistributed the works within that group, offered edits to other members, and thereafter redistributed the works outside the group and to the broader Facebook public. In the documented example, the user thereafter created a business/service collage incorporating Mapes's imagery, posted it through her personal Facebook profile, and solicited additional editing work. The sequence demonstrates how an image obtained through an editing group could be redistributed within the group and then carried to additional Facebook audiences. One September 29, 2026 notice specifically identified this cross-distribution pattern involving Photoshop Edit and Requests ORIGINAL, a group with approximately 84,000 members.

299. Thus, by the time of the conduct alleged below, Meta knew not only the identity of Mapes's protected works but also the particular Facebook communities, posts, URLs, and accounts through which those works were repeatedly being reproduced and redistributed.

300. Upon information and belief, notwithstanding that specific knowledge, Meta's Facebook systems continued affirmatively to distribute content from the identified groups and accounts beyond the users who initially uploaded the infringing material.

301. Meta itself states that content from public Facebook groups may be shown to users in their Facebook Feed and elsewhere on Facebook, including to persons interacting with public groups. Meta therefore does not merely maintain a private storage folder containing group material; its systems select and distribute group content through Facebook's broader content-delivery environment.

302. Upon information and belief, Meta's ranking, recommendation, and content-selection systems selected posts from the identified editing groups for distribution in Facebook Feed based upon signals including user interaction, comments, reactions, recency, group participation, predicted interest, and other engagement criteria controlled and implemented by Meta.

303. That distribution was an affirmative act by Meta separate from the user's initial upload. The uploading user chose to place an image into a group; Meta thereafter determined, through systems designed and operated by Meta, which additional Facebook users would be shown that post, where it would appear, how prominently it would appear, and how frequently it would be presented.

304. Upon information and belief, Meta similarly selected and presented identified editing groups to Facebook users through group-discovery and recommendation functions, including suggested-group, recommended-group, related-group, search, Feed, and other discovery surfaces designed to increase membership and participation in Facebook groups.

305. Upon information and belief, Meta used information concerning a user's prior viewing, group membership, editing activity, interactions with related posts, interests, social connections, and other engagement signals to determine which editing groups and editing-group content to recommend or surface to that user.

306. As a result, users who had not independently navigated to an identified editing group could be affirmatively exposed by Meta to that group or its content and could thereafter join the group, obtain Mapes's works, request edits, download source images, create derivatives, or redistribute those derivatives.

307. Upon information and belief, Meta also affirmatively generated and delivered notifications concerning activity in the identified groups, including notifications concerning new posts, comments, replies, reactions, and other group activity.

308. Those notifications materially increased the likelihood that a source-template post would be seen by additional group members after its initial upload and that those members would return to the post, download the protected work, submit an edit, request an edit, comment on the work, or redistribute a resulting derivative.

309. This mechanism is particularly significant in the editing-group context because the infringement alleged here frequently occurred through a cascading sequence: one user uploaded a Mapes work as an editing template; additional users were exposed to the source post; those users created and uploaded derivative images; other users then viewed, downloaded, commented upon, shared, or further modified those derivatives.

310. Upon information and belief, each new comment, edit, reaction, or derivative upload generated additional engagement signals that Meta's systems used to rank, distribute, resurface, or notify users concerning the underlying post or related group activity.

311. Accordingly, the infringing reproduction process itself generated the engagement that caused Meta's systems to give the source post and resulting derivatives additional distribution. A post that generated thirty unauthorized edits did not remain a single static upload; the additional unauthorized activity produced additional interactions, which upon information and belief caused Meta affirmatively to circulate the post and resulting content to still more users.

312. Upon information and belief, Meta's systems treated that engagement as a positive distribution signal without excluding a post, image, group, or account merely because Meta had received a copyright notice specifically identifying the work and underlying infringement.

313. As a result, after Meta received specific notice that a Mapes work was serving as source material for repeated unauthorized editing, Meta continued, upon information and belief, to

use the engagement generated by that same infringing activity to determine that the post, group, account, or related content should receive additional distribution.

314. That conduct is materially different from merely declining to terminate internet access to a subscriber. Meta possessed the specific content, group, account, URL, and engagement information necessary to distinguish the reported infringement from unrelated Facebook activity, and its own systems determined whether, when, where, and to whom the identified Facebook content would be affirmatively delivered.

315. Upon information and belief, Meta also continued affirmatively to recommend or surface the identified editing groups after those groups had repeatedly been reported to Meta for infringement of Mapes's works.

316. Mapes repeatedly asked Meta not to treat individual reported URLs in isolation, but instead to review the relevant account, group activity, prior copyright complaints, and repeat-infringer history. Her September 2026 notices expressly asked Meta to review the groups and their prior infringement history because the same communities repeatedly produced additional unauthorized uses.

317. Upon information and belief, Meta nevertheless continued to apply its ordinary group-growth and discovery systems to those identified groups, including mechanisms that exposed the groups to prospective members, facilitated new memberships, and returned existing members to newly active posts.

318. Upon information and belief, Meta also supplied group administrators and moderators with tools that facilitate the growth and continued activity of Facebook groups, including membership-management functions, invitations, post-format tools, content-management tools, notifications, administration tools, and mechanisms for encouraging participation in group discussions.

319. Those tools have substantial lawful uses generally. Mapes does not allege that the mere existence of Facebook Groups or ordinary group tools establishes inducement. Instead, the significance of those tools here arises from Meta's alleged continued affirmative promotion and distribution of specifically identified groups and specifically identified infringing content after Meta knew the works, URLs, accounts, and repeat infringement at issue.

320. Upon information and belief, Meta had the technical ability to alter the distribution treatment of a particular post, account, group, photograph, hash, or substantially similar content without disabling Facebook Groups generally, yet continued to select and distribute the identified material through its recommendation and ranking systems.

321. Upon information and belief, Meta likewise had the ability to prevent an identified infringing image from being used as the basis of additional recommended, resurfaced, or promoted Facebook content while leaving lawful group activity unaffected.

322. The alleged affirmative conduct therefore does not depend on the proposition that Meta was required to shut down a general-purpose technology because some users infringed. It concerns Meta's own affirmative decisions and automated content-selection acts directed to particular content and communities about which Meta had already received specific infringement information.

323. The repeated pattern alleged herein permits the reasonable inference that Meta's continued distribution was not incidental to an unknown infringement. For years Mapes supplied Meta with infringement reports concerning the same work, the same category of editing groups, the same redistribution process, and, in multiple instances, the same or repeat users.

324. Every one of those 53 September 2026 direct notices stated that Meta's ordinary online reporting method was not functioning, preventing submission, or otherwise failing to process the reports, while Meta's automated responses repeatedly directed Mapes back to the same online-reporting mechanism.

325. The significance of that reporting history to contributory liability is not that failure to process a copyright notice independently creates liability. It does not. Rather, the reporting history establishes the extraordinary specificity of Meta's knowledge before Meta allegedly continued taking the affirmative distribution, recommendation, notification, ranking, and group-promotion actions described herein.

326. Unlike a general-purpose internet provider that knows only that an unidentified subscriber may infringe at some point, Meta knew the particular Mapes works, Facebook URLs, Facebook groups, posts, and in numerous instances accounts participating in the alleged infringement.

327. Upon information and belief, Meta's internal systems associated each Facebook post and photograph with unique content identifiers, uploader/account identifiers, group identifiers, timestamps, engagement metrics, and other metadata permitting Meta to identify precisely the material that Mapes reported.

328. Upon information and belief, Meta's recommendation and ranking systems operated upon those same internal content, account, and group identifiers. Meta therefore possessed both the knowledge identifying the particular infringement and the technical means by which its own systems chose whether to distribute that particular content to additional users.

329. Upon information and belief, Meta did not exclude reported Mapes content from those recommendation, ranking, notification, or discovery processes merely because it had been reported as infringing.

330. Instead, the continued engagement with reported posts, including comments requesting edits, users supplying completed edits, reactions, shares, and additional derivative uploads, upon information and belief continued to feed the same engagement signals used by Meta's systems to determine distribution and visibility.

331. That affirmative circulation materially assisted the underlying infringement because the editing process depended upon exposing the unauthorized source image to additional users.

Without delivery of the post to additional group members and participants, those additional users could not view the source work, download it, create derivatives from it, or return completed edits to the group.

332. Mapes also documented evidence that at least one unauthorized derivative generated from her work bore a "Meta AI" watermark. The preserved evidence states that Meta AI had been watermarked on Mapes's intellectual property in connection with the 581,000-member Free Photo Edits ORIGINAL group.

333. The Meta AI identifier supports the limited factual allegation that a Meta-branded artificial-intelligence or image-processing output was associated with the accused derivative image. The identifier does not, by itself, establish the precise Meta product used, the person who initiated the processing, the source input, or the sequence or timing of the processing.

334. The preserved image does not, by itself, establish the precise Meta product used, the identity of the user who initiated the processing, the instruction or prompt supplied, the source image submitted to the feature, the sequence of processing performed, or the manner in which the resulting output was stored or displayed.

335. Those facts, including the relevant input and output files, user instructions, product identifiers, processing records, content identifiers, timestamps, and associated account information, are uniquely or predominantly within Meta's possession and control.

336. Mapes preserves the Meta AI evidence because it may identify Meta-operated processing associated with an accused derivative. Plaintiff does not rely upon the Meta AI watermark alone as proof of direct infringement, contributory intent, or the particular technical operation that produced the image.

337. Upon information and belief, Meta also possesses image-matching, hashing, visual-recognition, and content-identification technologies capable of associating identical or substantially similar image files with prior uploads and reports.

338. Upon information and belief, Meta's image-matching, hashing, visual-recognition, and content-identification systems identified or associated at least some of Mapes's previously reported works with subsequent uploads, source-template uses, derivative edits, or submissions to Meta-operated editing or AI features. This inference is supported by Meta's demonstrated ability to process photograph-specific URLs and content identifiers, the repeated appearance of identical or substantially similar works after notice, and Meta's operation of systems capable of recognizing and associating image content. Plaintiff believes Meta's matching results, system logs, content identifiers, upload records, and feature-processing records will confirm the specific identifications and associations.

339. Upon information and belief, Meta also collected and retained extensive information regarding the performance of the identified posts and groups, including impressions, reach, recommendations, Feed distribution, comments, reactions, shares, membership growth, invitations, notifications, and other engagement measurements.

340. Upon information and belief, Meta delivered at least some reported infringing posts to users who had not specifically requested the copyrighted material and continued to recommend or amplify at least some of those posts after receiving Mapes's notices. Plaintiff believes Meta's content-delivery and recommendation records will confirm the specific events.

341. Upon information and belief, Meta affirmatively recommended at least some of the identified editing groups to additional users after receiving repeated reports that those same groups were being used to obtain, edit, reproduce, and redistribute Mapes's protected works. Plaintiff believes Meta's group-recommendation records will confirm the specific events.

342. Upon information and belief, after Meta received notices identifying particular Mapes works, accused Facebook locations, accounts, groups, and copying chains, Meta continued to undertake affirmative platform acts involving identified source posts and resulting derivatives, including recommending or resurfacing content, delivering posts through Feed, sending notifications,

suggesting identified editing groups, ranking content, and otherwise processing, hosting, displaying, transmitting, or distributing identified accused material. This inference is based on the documented continued circulation and multiplication of reported works; the repeated derivative-edit chains arising from individual source posts; Meta's work-, URL-, account-, and group-specific notice; Meta's documented operation of relevant distribution and engagement functions; and the continued appearance and redistribution of works after notice. Meta's recommendation-event, ranking, Feed-delivery, notification, group-suggestion, content-processing, access, transmission, impression, and enforcement records are expected to identify the specific work, post, group, account, date, recipient audience, and post-notice distribution event.

343. These alleged acts are not pleaded as abstract references to "the algorithm." Mapes alleges that Meta's own systems made discrete distribution and promotion decisions concerning identifiable Facebook content, groups, accounts, and users, including after Meta possessed the exact URLs and identifying information necessary to locate the infringement.

344. Mapes therefore pleads those matters upon information and belief based upon the documented continued circulation and multiplication of the reported works, the documented Facebook functionality by which group content is delivered to users, the millions of aggregate memberships in the identified editing groups, the repeated derivative-edit chains arising from individual source posts, Meta's specific notice of those chains, and the continued appearance and redistribution of the works after those notices.

345. Taken together, the allegations support an inference that Meta did more than knowingly provide a neutral communications service and fail to prevent infringement. After acquiring specific knowledge of the infringing works, posts, groups, accounts, and recurring editing process, Meta allegedly continued through its own product systems to place the identified content and communities before additional users and thereby affirmatively assisted the repeated reproduction, alteration, and redistribution of Mapes's works.

346. Upon information and belief, Meta undertook the affirmative acts alleged above with knowledge that those acts would encourage and assist further copying, alteration, display, and distribution of Mapes's specifically identified works and with the purpose of increasing engagement and participation in the same reported activity. Those acts constitute intentional encouragement and material assistance of the direct infringements alleged herein and satisfy the intent requirement for contributory copyright infringement. Plaintiff believes Meta's recommendation, notification, ranking, engagement-optimization, and content-delivery records will confirm the purpose and operation of those affirmative acts.

**META'S RIGHT AND ABILITY TO SUPERVISE**

347. Meta owns and operates Facebook and establishes the rules governing Facebook accounts, pages, groups, user-generated content, and the related hosting, display, sharing, reporting, and enforcement functions. Meta possesses the contractual and technical authority to remove or disable identified content and to restrict, suspend, or terminate Facebook accounts, pages, and groups.

348. Meta's supervisory authority extends to the particular accounts, groups, and Facebook content identified in the preceding allegations. Meta maintains identifiers associating uploaded content with accounts and groups and possesses records reflecting uploads, account activity, group administration, copyright reports, content-removal decisions, and enforcement history.

349. Meta has demonstrated its ability to act upon particular reported Facebook content by processing copyright complaints and advising Mapes that identified material had been removed or was already unavailable. Those communications establish that Meta could locate and take enforcement action concerning at least some of the particular content identified in Mapes's notices.

350. Mapes repeatedly supplied Meta with particular URLs, account and group information, and allegations that identified users or groups had previously engaged in substantially similar infringement. Plaintiff alleges that Meta possessed the right and practical ability to exercise

its supervisory authority with respect to those identified accounts, groups, and content, regardless of whether Meta ultimately exercised that authority effectively.

351. Mapes accordingly alleges that Meta possessed both the right and the practical ability to supervise or stop the specific Facebook-hosted direct infringements underlying the vicarious-liability claim.

**META'S DIRECT FINANCIAL BENEFIT FROM THE IDENTIFIED INFRINGEMENT**

352. Meta derived a direct financial benefit from the infringement alleged herein. Mapes does not rely merely on the general proposition that Meta is a profitable company or that Facebook as a whole earns advertising revenue. The financial benefit alleged here is tied to the specific infringing advertisements, posts, pages, groups, and engagement generated by the unauthorized exploitation of Mapes's copyrighted works.

353. The direct financial benefit arises through multiple, overlapping mechanisms, including: (a) advertising impressions and other monetized activity generated when users viewed and interacted with specific infringing Facebook posts; (b) additional user visits, page views, notifications, comments, reactions, and return sessions generated by the repeated editing and redistribution of Mapes's works; and (c) the role of Mapes's copyrighted works themselves as a draw attracting and retaining users within large Facebook editing communities whose activity Meta monetizes.

354. These allegations concern a causal connection between the particular infringement and Meta's financial benefit, not merely a generalized allegation that infringement exists somewhere on an advertising-supported platform.

355. Upon information and belief, the unauthorized use of Mapes's copyrighted works in the identified source posts caused at least some users to access, view, or return to those particular posts or their resulting derivative-image discussions who would not otherwise have engaged with that content. Plaintiff bases this allegation on the preserved sequences of editing requests, derivative-

image submissions, and subsequent comments concerning the particular protected images. To the extent Meta delivered paid advertising during the resulting user sessions, the incremental user activity attributable to those works furnished an identifiable source of potential advertising revenue. The extent to which such activity generated revenue, rather than merely an opportunity to generate revenue, is reflected in Meta's advertising and session records.

**Meta's Financial Interest in the Identified Infringement**

356. Meta derives substantial revenue from advertising displayed through Facebook and its other advertising-supported services. Under Meta's publicly described advertising model, advertising revenue is generated through paid impressions and other advertiser-compensated actions associated with users' activity on its services.

357. The identified Facebook editing groups generated observable activity directly associated with Mapes's copyrighted works. In Facebook Group ID 1062897731479032, an unauthorized source posting involving Santa with Magic Snow Globe generated approximately 30 resulting edits. In Facebook Group ID 1691407778345208, another unauthorized posting involving the same registered work generated approximately 15 edited responses. These were particular instances in which Mapes's protected expression supplied the source material around which the ensuing Facebook activity occurred.

358. The resulting activity included users retrieving source photographs, requesting edits, uploading derivative images, viewing completed images, and interacting with the resulting posts and comments. In those instances, the protected imagery was central to the particular editing activity rather than an incidental element of otherwise unrelated content.

359. The evidence also identifies unauthorized use of Mapes's Horror Halloween imagery by Weirdo History Facts, a Facebook page documented as having more than 900,000 followers. On September 27, 2026, Mapes specifically notified Meta of that use and requested preservation of the

page's and post's monetization records. Plaintiff does not allege that the page's total follower count establishes the actual number of viewers of the particular accused post.

360. The commercial significance of the unauthorized imagery is further illustrated by Cinepage's use of Mapes's HOMESCHOOL photographs alongside solicitations for paid Facebook subscriptions, as alleged above. The photographs were used to attract attention to a Facebook page seeking to convert viewers into paying subscribers. Plaintiff does not presently allege that Meta retained a portion of those subscription payments. Rather, Plaintiff alleges, upon information and belief, that the identified unauthorized photographs also attracted and retained Facebook users, generating views, page visits, interactions, and additional advertising-supported activity from which Meta received financial benefit. Plaintiff believes Meta's post-level, session-level, advertising, and monetization records will confirm the connection between that specific infringement-related activity and Meta's revenue.

361. Upon information and belief, at least some Facebook sessions in which users accessed or interacted with the identified infringing content also included paid advertising delivered by Meta. This allegation is based on Facebook's advertising-supported business model, the observed activity associated with the particular accused content, and Meta's ordinary delivery of advertising to users of its services. The precise advertising events, associated sessions, advertiser payments, and resulting revenue are matters reflected in Meta's internal records.

362. Upon information and belief, the identified Mapes source posts and resulting derivative-edit threads functioned as a draw for users because users accessed the posts to obtain, request, create, view, comment on, share, or return to edits of the particular Mapes works. Plaintiff's belief is based on the preserved source-post-to-derivative-edit sequences, including instances in which one Mapes source image generated multiple separately displayed derivative edits and associated user interactions. Meta's content-level engagement and referral records will identify

whether users reached, joined, revisited, or engaged with the relevant posts or groups because of those identified works.

363. Plaintiff alleges that the identified unauthorized works attracted users to particular posts, stimulated additional editing and derivative-image activity, and generated additional opportunities for advertising-supported user engagement. Plaintiff seeks to establish through Meta's content-level and session-level records the extent to which that specific activity resulted in advertising revenue or other direct financial benefit to Meta, rather than attributing Meta's general advertising revenue to the alleged infringement.

364. Upon information and belief, Meta maintains records identifying impressions, views, engagements, advertising activity, and monetization associated with the relevant content, accounts, pages, groups, and user sessions. Such records are necessary to identify and quantify the direct financial benefit to Meta attributable to the specific infringement alleged herein.

**Meta's Publicly Disclosed Advertising Model**

365. Meta's public financial disclosures describe the mechanism through which user attention and activity on its Family of Apps are principally monetized. In 2025, Meta reported approximately $198.759 billion in Family of Apps revenue, of which approximately $196.175 billion consisted of advertising revenue.

366. Meta states that it generates substantially all of its Family of Apps revenue from advertising and that its advertising revenue is generated by displaying advertising products on Facebook and its other Family of Apps services.

367. Meta further states that marketers pay based on the number of advertising impressions delivered or the number of actions, such as clicks, taken by users.

368. Meta recognizes impression-based advertising revenue when an advertisement is displayed to a user and action-based revenue when the user takes the action for which the marketer

contracted. Meta further states that it controls the advertising inventory before that inventory is transferred to advertisers.

369. During the second quarter of 2026, Meta reported approximately $59.363 billion in advertising revenue and a 14% year-over-year increase in advertising impressions delivered across its Family of Apps.

370. These public financial facts are not alleged, standing alone, to establish a direct financial benefit from Mapes's infringement. They identify the mechanism through which Meta monetizes Facebook activity. The causal connection to the infringement alleged here rests on the work-specific facts below showing that Mapes's unauthorized imagery itself generated identifiable views, editing activity, derivative uploads, comments, redistribution, and repeated participation.

371. Mapes's own Facebook Creator Dashboard provides work-specific evidence that posts centered on her photographs and digital works attract large audiences, generate sustained engagement, and produce measurable earnings. From January 1 through October 20, 2026, Meta reported 13,769,958 views, 1,434,854 engagements, and $2,884.37 in approximate earnings for the Tara Mapes Photography page. Meta separately reported 4,374,107 views, 407,226 engagements, and $584.80 in approximate earnings for the 60-day period from August 22 through October 20, and 1,756,070 views, 173,168 engagements, and $222.75 in approximate earnings for the 28-day period from September 23 through October 20. At the individual-post level, Little Rays of Sunshine generated 2,748,316 views, 1,641,505 viewers, 338,693 engagements, 29,267 reactions, 290,782 clicks, 2,616 comments, 4,640 shares, 2,189 follows, and $498.91 in approximate earnings; White Widow generated 1,369,604 views, 869,131 viewers, 111,602 engagements, 14,924 reactions, 90,896 clicks, 1,084 comments, 1,590 shares, 1,068 follows, and $352.78 in approximate earnings. Six additional representative posts each generated between 37,589 and 950,885 views and between 3,796 and 84,022 engagements. (See Exhibit N.)

372. Meta attributed between 62.7% and 98.3% of the views for the representative posts to non-followers, including 98.3% for Little Rays of Sunshine and 97.2% for White Widow. For context, a 2026 Socialinsider benchmark analyzing 25 million Facebook posts from 130,683 active business pages reports that album posts by pages with 100,000 to 1 million followers averaged approximately 1,150 views, 77 likes, 10 comments, and 7 shares. The representative Mapes posts in Exhibit N generated between 37,589 and 2,748,316 views, 916 and 29,267 reactions, 43 and 2,616 comments, and 61 and 4,640 shares. On raw counts, those posts generated approximately 33 to 2,390 times the benchmark views, 4 to 262 times the benchmark comments, and 9 to 663 times the benchmark shares. The scale and non-follower reach of those results support the inference that Meta distributed Mapes's works far beyond her existing follower base and that the works function as a substantial draw for Facebook audiences. (See Exhibit N.)

373. Meta's own records connect the performance of specific Mapes content to monetization by reporting approximate earnings alongside work-specific views, unique viewers, reactions, clicks, comments, shares, follows, and non-follower distribution. The accused posts and derivative-edit chains reproduced and circulated Mapes's photographs and digital works, whose demonstrated ability to attract and retain Facebook audiences is reflected in Exhibit N. Plaintiff alleges on information and belief that Meta received a direct financial benefit from the identified infringement because the infringing posts and derivatives drew users to the accused posts, pages, and groups; prompted views, clicks, comments, shares, derivative responses, repeat visits, and continued participation; and increased engagement with Meta's platform and monetized surfaces. Plaintiff further alleges on information and belief that Meta distributed and resurfaced at least some of that infringing activity and served advertising or obtained other compensated engagement during the resulting user sessions. Meta's content, session, distribution, advertising, and monetization records will confirm the impressions, monetized actions, and revenue attributable to the identified infringement. (See Exhibit N.)

**Specific Infringing Posts Generated Repeated User Engagement**

374. The Facebook editing-group infringement likewise generated identifiable user activity tied directly to Mapes's copyrighted works.

375. The evidence demonstrates that a single unauthorized upload of one Mapes work could generate dozens of additional user interactions and unauthorized derivative uses. In September 2026, Mapes documented one source post in the over 580,000-member Free Photo Edits ORIGINAL group that generated approximately 30 to 31 separate edits from a single unauthorized template, and another source post in an approximately 81,000-member editing group that generated approximately 15 edits.

376. The preserved evidence concerning the over 580,000-member group includes numerous individual Facebook URLs associated with the derivative activity arising from that single source post. The screenshots document the blank template being offered for editing and approximately 30 resulting edits beneath the same post.

377. One representative example concerns Facebook Group ID 1062897731479032, identified as Free Photo Edits ORIGINAL, with approximately 581,000 members. Mapes documented an unauthorized source-image posting involving Santa with Magic Snow Globe, Registration No. VA0002151851, that generated approximately 30 to 31 separate edited responses. The resulting content reflects repeated participation centered on Mapes's particular artwork, rather than merely the passive availability of an infringing file (See Exhibits B and D).

378. A second example concerns Group ID 1691407778345208, identified as Free Photoshop Requests: Photo Edits, Fixes & Restorations, with approximately 81,000 members. Mapes documented a separate source-image posting involving the same registered work that generated approximately 15 edited responses. In each example, the protected image functioned as the source material attracting the ensuing editing activity and producing additional content and interactions on Facebook (See Exhibits B and D).

379. Those examples provide identifiable starting points for determining the financial value Meta derived, if any, from the particular infringements, including the source-post impressions, derivative-image displays, return visits, recommendation activity, advertising impressions, and associated revenue. The evidence establishes multiple actual editing responses; the precise number of resulting monetized events remains within the records maintained by Meta.

380. Those derivative edits necessarily generated activity beyond the initial upload: users viewed the source image, responded to it, created edits, returned completed edits, viewed other users' edits, commented, reacted, and returned to the underlying post or group.

381. Upon information and belief, each such act generated additional Facebook impressions, page views, content-delivery events, notifications, return visits, or other measurable engagement associated with the identified source post, resulting derivative content, and the group in which the activity occurred.

382. Upon information and belief, Meta records such activity at a granular level, including impressions, reach, views, reactions, comments, shares, notifications, Feed delivery, recommendation events, session activity, and other engagement associated with specific posts, content IDs, accounts, pages, and groups.

383. Upon information and belief, Meta also records the advertising impressions and advertising revenue generated during Facebook sessions in which users engage with particular posts, groups, pages, and content.

**The Infringing Material Acted as a Draw for Users**

384. The unauthorized Mapes imagery was not merely incidental content appearing momentarily inside unrelated Facebook communities. In the editing groups identified herein, photographs and digital backgrounds are themselves the material around which the editing activity occurs.

385. Users enter and participate in these communities to obtain photographs and image templates, request edits, create edited versions, view completed edits, and redistribute those results.

386. When a Mapes photograph is uploaded as a source template, the protected work itself therefore becomes the object around which the ensuing user activity occurs.

387. The resulting infringement can operate as a draw in at least two related respects: the unauthorized image attracts users to the particular post, and the availability of large quantities of source imagery for free editing attracts and retains users within the editing group.

388. The accused editing activity involved imagery for which Mapes charged a separate license fee and for which she offered her own paid compositing services. The source-image posts therefore supplied group participants with a creative asset that otherwise had a commercial licensing market, while the requested and completed edits could substitute for services Mapes ordinarily performed for paying customers. The same unauthorized images generated identifiable Facebook activity, including edit requests and completed derivative responses.

389. The scale of the identified communities reinforces the significance of that draw. By September 2026, Mapes had identified eighteen editing groups with approximately 2.995 million aggregate memberships, including newly identified groups totaling approximately 1.717 million memberships.

390. Upon information and belief, the availability of source images to edit, including Mapes's unauthorized works, caused users to open particular posts, remain in the groups, return when additional edits or requests were posted, join the groups, and engage with other group content.

391. Upon information and belief, those additional visits and interactions increased the quantity of Facebook content consumed and the number of opportunities Meta had to deliver paid advertising to those users.

392. Upon information and belief, Facebook's advertising systems monetize user attention generated by such activity by serving advertisements during the Facebook sessions through which users access, discover, view, and interact with group content.

393. Accordingly, where an infringing Mapes image attracted users to a post or caused them to return repeatedly to view or participate in the resulting edits, the infringement generated additional monetizable user activity for Meta.

394. This causal theory is not that every dollar earned by Facebook is attributable to infringement. It is that particular infringing content generated particular user activity, and that activity generated additional monetizable impressions and advertising opportunities that would not otherwise have occurred.

395. The unauthorized Mapes works supplied a product of independent commercial value that was central to the activity attracting users to the accused editing posts. Mapes licensed digital backgrounds for approximately $24.99 and separately offered compositing services beginning at $75 for one person. In the accused Facebook editing groups, users could obtain access to those backgrounds without purchasing the corresponding licenses and could request or provide competing compositing services using the unauthorized images. The availability of the copyrighted background itself therefore supplied a reason for users to access the particular Facebook post and participate in the resulting editing activity. The work was not merely decorative material appearing alongside unrelated Facebook content; it was the creative asset the participants sought to obtain and use.

**Repeated Derivative Activity Multiplied the Financial Benefit**

396. The structure of the editing-group infringement amplified that economic benefit because a single source infringement frequently produced numerous subsequent acts of engagement and copying.

397. The resulting infringement operated as a draw in two related respects: the unauthorized image attracted users to the particular post, and the availability of source imagery for free editing

attracted and retained users within the editing group. Upon information and belief, Meta measured and monetized at least some user sessions and advertising impressions associated with users opening, viewing, responding to, sharing, returning to, or otherwise interacting with identified infringing posts and derivative-edit chains. The multiplication of a source work into numerous unauthorized edits also multiplied the user attention and activity associated with the identified source post and derivative-edit chain.

398. Upon information and belief, Meta maintains, or can derive from its ordinary business records, information concerning impressions of each identified infringing post; unique and repeat viewers; Feed- and recommendation-driven impressions; group-origin and external impressions; comments, reactions, shares, derivative uploads, and other engagement; notification events and resulting click-throughs or return sessions; recommendation and suggested-group events; group joins and membership growth following recommendations or high-performing posts; time spent viewing or interacting with identified posts and derivative threads; advertisements served during sessions attributable to identified content; advertising impressions and revenue associated with a particular page, group, post, or user session; monetization or revenue-sharing programs applicable to a responsible page or account; and any internal metric attributing revenue, engagement, retention, or user growth to particular content, pages, groups, advertisers, or campaigns. These records are expected to permit reconstruction of the source-post-to-derivative-edit chains and identification of users whom Meta itself directed to identified infringing material, together with advertising activity associated with those sessions.

399. The same causal structure applies to repeat infringers who obtained Mapes's works from an editing group and then redistributed them outside the original group. Mapes documented, for example, a user who obtained her work through an approximately 84,000-member group and thereafter redistributed it both within the group and through a personal Facebook profile while

offering additional edits. The redistribution expanded the audience exposed to the work and created further opportunities for Facebook engagement and monetization.

400. Upon information and belief, Meta financially benefited from that expanded distribution to the extent it generated additional Facebook views, sessions, advertising impressions, or other monetized engagement.

**High-Performing Pages and Posts**

401. The financial connection is not limited to editing groups. Mapes also documented infringement by high-reach Facebook pages.

402. On September 27, 2026, Mapes notified Meta that the Facebook page Weirdo History Facts, which had more than 900,000 followers, had uploaded and displayed one of her photographs registered as part of Horror Halloween Tara Mapes, Registration No. VA0002464853.

403. In that notice, Mapes specifically demanded that Meta preserve "all monetization records for this page and for Meta related to this high performing post."

404. Upon information and belief, Meta maintains records showing the reach, impressions, engagement, recommendation history, advertising impressions, monetization status, and revenue associated with that post and/or activity generated by that post.

405. Upon information and belief, if the post generated advertising impressions, sponsored-content impressions, monetized sessions, or other revenue-generating activity, Meta received financial value directly attributable to the audience drawn to and retained by that specific unauthorized use of Mapes's photograph.

406. Upon information and belief, Meta delivered advertisements adjacent to, between, before, after, or during at least some user sessions involving that post; recommended or resurfaced the post to additional users; and recorded the resulting impressions, repeat views, and advertising revenue attributable to those interactions. This inference is supported by the post's documented reach and engagement and Meta's operation of advertising, recommendation, and content-delivery systems

that measure activity associated with particular content. Plaintiff believes Meta's advertising-delivery, recommendation, impression, session, monetization, and revenue records will confirm the number of such interactions and the resulting revenue.

407. Meta's publicly described Facebook Content Monetization program further demonstrates that Meta measures the economic performance of individual pieces of Facebook content, including photographs. In March 2026, Meta publicly identified qualified views, earnings rates, and content-specific performance as components of its creator-monetization framework. Upon information and belief, Meta maintains information sufficient to determine whether the accused pages or accounts participated in such programs, whether particular accused photographs were eligible for monetization, whether any revenue or creator payments were associated with those photographs, and whether Meta received advertising revenue related to their distribution. Plaintiff does not presently allege that every accused page or account was enrolled in a monetization program.

**Meta's Recommendation and Notification Systems Increased the Monetizable Audience**

408. As alleged above, upon information and belief Meta did not merely wait for users independently to navigate to the accused content. Its systems recommended, ranked, resurfaced, notified users about, and otherwise distributed group content to additional Facebook users.

409. Each such affirmative distribution event increased the number of potential viewers of the infringing material.

410. Upon information and belief, those additional viewers generated additional opportunities for Meta to display advertisements and otherwise monetize their use of Facebook.

411. Accordingly, where Meta's recommendation or notification systems caused a user to view an identified infringing post or return to an infringing editing thread, Meta both enlarged the audience for the infringement and enlarged the audience available for monetization.

412. Mapes therefore alleges upon information and belief that the direct financial benefit from the infringement arose through one or more of the following concrete causal paths:

a. **Advertising against infringing engagement.** Specific infringing posts attracted user views and interactions during which Meta served advertising and received corresponding revenue.

b. **Repeat-session monetization.** Notifications, derivative edits, comments, and other activity surrounding an infringing source post caused users repeatedly to return to Facebook, creating additional monetized sessions.

c. **Recommendation-generated monetization.** Meta's distribution and recommendation of an infringing post or repeat-infringing group brought additional users to the activity and thereby generated additional advertising impressions.

d. **Group-retention and growth.** The availability of free source imagery, including Mapes's unauthorized works, acted as a draw attracting and retaining users in editing groups; the resulting increased membership, usage, and content consumption created additional advertising opportunities for Meta.

e. **High-reach page monetization.** Unauthorized Mapes works appearing on large Facebook pages generated substantial reach and engagement that, upon information and belief, produced advertising or other monetized activity traceable to the specific post.

f. **Multiplication of derivative content.** The creation of dozens of derivatives from a single unauthorized Mapes template multiplied the number of content items, interactions, views, and sessions generated from the initial infringement and correspondingly multiplied Meta's opportunities to monetize that activity.

413. These allegations differ materially from an allegation that Meta simply receives advertising or subscription revenue from Facebook generally. Mapes alleges a causal chain beginning with identified infringing content, continuing through identifiable views, edits, comments,

notifications, recommendations, derivative uploads, and user sessions, and ending in advertising impressions or other revenue-producing activity attributable to those interactions.

414. Accordingly, upon information and belief, Meta possessed an obvious and direct financial interest in the exploitation of the copyrighted material at issue because the infringing material itself attracted users, generated additional user activity, and increased content consumption and advertising opportunities.

**DAMAGES AND QUANTITATIVE HARM**

415. Mapes operates a commercial photography and digital-art business through which she creates, markets, licenses, and sells original photographs, digital backgrounds, templates, composites, and related photographic and digital products.

416. Mapes's copyrighted works possess independent commercial value. Customers who lawfully obtain Mapes's digital backgrounds and templates pay for the right to use the creative material that Mapes has invested time, labor, skill, and resources to produce.

417. The infringement alleged herein directly interferes with that commercial market.

418. In particular, unauthorized distribution of a blank Mapes template substitutes for the licensed digital product itself. Once an unauthorized source copy is posted to a Facebook editing group, users who otherwise would have needed to purchase or license the work can obtain the protected imagery through Facebook without compensating Mapes.

419. The resulting harm is not limited to the initial unauthorized upload. As alleged above, the purpose of the accused editing activity is frequently to permit additional users to obtain the source image, incorporate photographs or subjects into it, modify it, create derivative versions, and redistribute the resulting images.

420. One unauthorized upload of a Mapes digital background can generate multiple additional unauthorized reproductions and derivative uses. Mapes has documented that multiplication occurring in practice. In one Facebook editing group with more than 580,000 members, a single

unauthorized source template generated approximately 30 to 31 resulting edits. In another Facebook editing group with approximately 81,000 members, one source post generated approximately 15 edits. The full number of derivative uses attributable to reported source posts cannot presently be determined because many relevant posts, comments, derivative uploads, historical versions, deleted materials, and engagement records are maintained within Meta's systems. The documented examples nevertheless demonstrate that downstream use is not hypothetical and that a one-post/one-use assumption can materially understate the exploitation of Mapes's works. (See Exhibits B and D)

421. With respect to Santa with Magic Snow Globe, Registration No. VA0002151851, Mapes's existing damages records identify approximately 3,321 reported infringing posts or URLs associated with the damages analysis for that work.

422. Mapes's business involved two distinct commercial offerings relevant to the editing-group infringement: the licensing of original digital backgrounds and the performance of custom compositing services using those backgrounds. Mapes offered individual digital-background licenses for approximately $24.99. Separately, she charged a minimum of $75 to composite one person into a digital background, with an additional $25 for each additional person.

423. Accordingly, an authorized transaction involving the purchase of one background and one-person compositing services could generate $99.99 in gross revenue, with higher charges for additional persons. That amount is evidence of historical transaction pricing; it is not alleged to be the recoverable damages amount for every unauthorized Facebook upload, display, edit, or download.

424. The unauthorized editing-group activity potentially affected both revenue streams. An unauthorized source-image distribution could substitute for the purchase of a lawful background license, while a group member's unauthorized use of that background to perform compositing services could compete with the separate editing services Mapes offered to paying customers.

425. Mapes's reporting archives contain thousands of accused-URL entries and notice occurrences. Because the records include repeated reports, responses, and follow-up communications

concerning the same material, the reported-URL totals are not presently alleged to constitute an equivalent number of unique infringing posts, distinct downstream uses, displaced customer transactions, or compensable damages units.

426. Mapes therefore seeks damages based on proven displaced licensing and editing transactions, the fair market value of the rights infringed, recoverable lost profits and other causally established economic injury, and any additional recoverable profits attributable to infringement under 17 U.S.C. § 504(b), without double counting overlapping injuries.

427. The scope of the injury also extends beyond VA0002151851. As alleged above, multiple registered Mapes works were reproduced, altered, redistributed, publicly displayed, commercially exploited, and/or incorporated into Facebook advertising without authorization.

428. Damages will therefore be determined work-by-work and infringement-by-infringement, taking into account the registration governing the particular work, the date and nature of the infringement, the identity of the responsible defendant, and the remedies legally available for that work and conduct.

429. Mapes additionally seeks any profits of Meta attributable to the infringement under 17 U.S.C. § 504(b).

430. Upon information and belief, those profits are distinct from Mapes's own losses and include monetized user activity generated by the identified derivative-edit chains, recommendation-driven engagement, and other revenue directly connected to the accused activity. Meta's financial, impression, session, and revenue-allocation records are expected to quantify the amount attributable to that activity.

431. With respect to Facebook groups, pages, and user posts, Meta likewise possesses information necessary to establish whether particular infringement generated monetized activity, including impressions, reach, repeat views, Feed distribution, recommendations, notifications, user sessions, advertising impressions, engagement, and associated revenue.

432. Plaintiff alleges upon information and belief that Meta earned profits attributable to at least some of the identified infringement-related sessions and content-delivery events. The relevant financial and engagement information is exclusively or predominantly within Meta's possession and control.

433. Mapes therefore seeks recovery of Meta's profits only to the extent the evidence establishes the required causal relationship between the infringement and Meta's revenues and subject to the allocation and apportionment requirements applicable under § 504(b).

434. For works and infringements eligible for statutory damages, Mapes alternatively seeks statutory damages under 17 U.S.C. § 504(c).

435. Mapes seeks enhanced statutory damages for willful infringement only where the evidence establishes willfulness and such damages are legally available.

436. Mapes does not equate the number of Facebook URLs, posts, copies, edits, advertisements, or registration certificates with the number of statutory-damages awards.

437. Statutory-damages eligibility and the legally relevant number of works will be determined under the Copyright Act, including the requirements of 17 U.S.C. § 412 and the applicable rules governing commencement of infringement, registration timing, and treatment of works contained in group registrations.

438. Where actual damages and attributable profits provide the applicable remedy, Mapes seeks those amounts under § 504(b). Where statutory damages are available and elected, Mapes seeks the amount permitted by § 504(c).

439. To the extent multiple persons or entities are ultimately liable for the same infringement or overlapping injury, any recovery will be reconciled consistent with governing principles concerning joint liability, apportionment, prior recovery, and election of remedies.

440. The quantitative allegations presently known to Mapes therefore represent a floor on the factual record rather than a complete accounting of the infringement. Meta's internal content,

account, advertising, recommendation, engagement, and monetization records are necessary to determine the complete number of actionable uses and the resulting damages and attributable profits.

## IDENTIFICATION AND PRESERVATION OF DIRECT INFRINGERS

441. Many of the underlying direct infringements identified in this Complaint were committed through Facebook accounts whose legal owners cannot reliably be identified from publicly visible Facebook names, profile photographs, screen names, or vanity URLs alone.

442. Public-facing Facebook information may not disclose the legal name, address, email address, telephone number, or other identifying information necessary to determine the person responsible for a particular upload or to distinguish among similarly named users.

443. Meta possesses account and subscriber records that can identify the persons responsible for the accused activity and connect individual Facebook posts to the accounts that created, uploaded, published, edited, or administered them.

444. Those records are relevant not merely to potential claims against direct infringers. They are also relevant to establishing the predicate direct infringement underlying Mapes's secondary-liability claims against Meta, the existence of repeat infringement, Meta's knowledge, Meta's ability to supervise the infringement, and Meta's treatment of previously reported accounts.

445. Meta possesses account and subscriber records capable of identifying the persons responsible for the accused activity and connecting individual Facebook posts to the accounts that created, uploaded, published, edited, administered, removed, restored, or republished them. For accounts associated with identified infringing material, relevant records include displayed and historical names; Meta internal account or user identifiers; registration and historical email addresses; linked telephone numbers; available subscriber or address information; account-creation information; historical account identifiers; content, photograph, post, or object identifiers; upload and publication timestamps; available source and upload metadata; and linked pages, groups, business accounts, advertising accounts, or other Meta accounts relevant to the accused activity.

446. The identity and role of Facebook group administrators and moderators are likewise material.

447. Upon information and belief, Meta maintains current and historical records identifying persons who created, administered, moderated, owned, or otherwise controlled the accused Facebook groups.

448. Relevant group records include the identity of current and historical administrators and moderators; dates on which each person acquired or relinquished a role; changes in group ownership or control; creation dates; historical group names; group identifiers; membership information; administrator and moderator actions concerning particular posts; approval or rejection of content where applicable; and enforcement actions involving the group.

449. Such records can establish whether the same persons operated multiple editing groups, whether administrators migrated users or activity between groups, whether later groups constituted continuations or replacements of previously reported communities, and whether administrators continued facilitating the accused editing activity after copyright complaints.

450. Meta likewise possesses the enforcement history associated with the identified content, users, pages, groups, and administrators.

451. Relevant enforcement records include Mapes's notices and associated report numbers or case tokens; internal routing and escalation records; content-review decisions; copyright strikes; repeat-infringer determinations; warnings; account restrictions; group restrictions; removals; restorations; appeals; counter-notifications; decisions to leave particular content, accounts, pages, or groups active; and the factual or policy basis for those decisions.

452. Those records are particularly important where Meta represented that reported content had been removed but Mapes thereafter observed the material remaining accessible or where allegedly repeat-infringing accounts or groups continued operating after multiple reports.

453. Meta also possesses records concerning the restrictions and failures affecting Mapes's own ability to report infringement.

454. Relevant records include the reasons Mapes's reporting privileges were limited or restricted; warnings associated with further copyright reporting; internal flags or restrictions placed upon her account or reporting activity; support-ticket records; communications concerning restoration of reporting privileges; and records concerning the later failure of the online reporting mechanisms described above.

455. The reporting records should also identify whether a notice was accepted, rejected, blocked before submission, associated with a particular report or case number, treated as duplicative, or subsequently acted upon, and should distinguish original infringement reports from replies, follow-up communications, and renewed reporting of the same content (See Exhibit F).

456. With respect to Mapes's vicarious-liability and damages allegations, relevant records include impressions, unique users, repeat views, engagement, session activity, advertising impressions, paid boosts, subscriptions or paid features if applicable, page or creator monetization, advertiser spending, payments, and revenue associated as closely as practicable with the identified posts, pages, groups, advertisements, and relevant time periods.

457. For editing-group source posts that generated multiple derivative responses, relevant records include the original uploaded image and file metadata; the identities of the source uploader and each respondent who supplied an edited image; parent-post and comment relationships; creation and upload timestamps; image versions; deleted or removed content; post-sharing and redistribution history; and records showing whether an account sold, promoted, or solicited editing services in connection with the accused material. These records can establish whether the same persons operated multiple groups, whether administrators migrated users or activity between groups, whether later groups continued or replaced previously reported communities, whether administrators continued facilitating the accused activity after copyright complaints, whether Meta recognized later uploads of

previously reported works, and what Meta did after any such recognition. Preservation is necessary because Facebook content can be deleted, removed, restored, edited, renamed, transferred between administrators, or rendered unavailable to the public while corresponding internal records remain within Meta's possession.

458. Those records are material to distinguishing the initial unauthorized upload from subsequent independent reproductions or derivative uses, avoiding duplicate counting of the same Facebook object, identifying the actual direct infringers, and determining which acts occurred after specific notice to Meta.

459. Meta further possesses or controls records necessary to determine whether identical or substantially similar copies of Mapes's works were identified through image-matching, hashing, artificial-intelligence, visual-recognition, or other content-identification systems.

460. Mapes has repeatedly requested preservation of content, account, enforcement, group, and monetization information associated with identified infringements.

461. The identified Meta records are relevant because they bear on the identity of direct infringers, the notice and enforcement history associated with identified material, Meta's alleged post-notice conduct, and damages.

**COUNT I - CONTRIBUTORY COPYRIGHT INFRINGEMENT AGAINST META**

462. Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

463. Identified Facebook users, account holders, page operators, editors, and editing-group participants directly infringed Mapes's copyrights by reproducing her protected works, preparing unauthorized derivative images, distributing copies, and publicly displaying those works or derivatives without authorization. The specific copyrighted works, representative accused Facebook locations, and relevant accounts and groups are identified in the preceding allegations and accompanying exhibits.

464. Those direct infringements include unauthorized source-image postings and subsequent derivative editing involving Santa with Magic Snow Globe, unauthorized Facebook uses of other specifically identified registered photographs, and repeated commercial and derivative-image uses associated with Angelic Ice Photography. The preceding allegations identify representative works, registration numbers, accounts, Facebook locations, reporting dates, and the nature of the unauthorized activity.

465. Meta received particularized information concerning identified direct infringements through copyright-report submissions, written communications, follow-up correspondence, and additional notices. The March 2025 Angelic Ice communications and September 2026 direct notices identified particular works, accused Facebook content, and the accounts, pages, or groups associated with that content.

466. Meta's knowledge was not limited to generalized awareness that copyright infringement can occur on a social-media service.

467. Over a period of years, Mapes repeatedly supplied Meta with information identifying particular copyrighted works and particular instances of infringement occurring through Facebook.

468. Those communications included specific Facebook URLs; registration information; authorized source material; screenshots; identified groups and pages; identified users and accounts; repeat-infringer information; and explanations of the manner in which particular Mapes works were being reproduced, altered, and redistributed.

469. By March 2025, Meta also had highly specific notice concerning the Angelic Ice Photography and Tanisha Lloyd infringement alleged above.

470. On March 23, 2025, Mapes submitted seventeen copyright reports identifying direct URLs associated with that activity.

471. Mapes thereafter pursued Meta through support tickets, telephone communications, emails, communications with counsel, and certified written notices after she alleges Meta restricted her ability to submit additional copyright reports through its ordinary reporting system.

472. Mapes ultimately supplied Meta with information concerning approximately 344 accused uses associated with the Angelic Ice matter and, after Meta represented that reported material had been removed, informed Meta that accused material remained accessible and supplied the identified URLs again.

473. The specific notice continued thereafter.

474. In late September 2026 alone, Mapes sent 53 unique direct copyright notices to Meta identifying 145 distinct Facebook infringement URLs.

475. Those notices identified particular works, particular URLs, particular groups and pages, and in numerous instances particular repeat users and the relationship between a source upload and resulting derivative infringements.

476. Meta therefore possessed actual knowledge of particular direct infringements and, in many instances, knowledge of the broader Facebook activity through which the reported work was being repeatedly reproduced.

477. Mapes does not rely upon that knowledge, standing alone, to establish contributory liability.

478. Plaintiff does not allege that Meta became contributorily liable merely by operating Facebook, receiving copyright notices, failing to remove material, or continuing to provide generally available services to persons who allegedly infringed Mapes's copyrights.

479. The underlying direct infringements occurred through the repeated use of identifiable Facebook functionalities. Users uploaded copies of Mapes's protected works as source images, other users accessed those images and prepared unauthorized derivative works, and the resulting copies and derivatives were distributed through additional Facebook posts, comments, replies, and accounts. The

representative chains described above identify particular works, source posts, derivative content, and participating accounts or groups.

480. After Meta received the particularized notices described above, some of the identified content allegedly continued to be accessible through Facebook, as reflected in the preserved post-notice evidence. Upon information and belief, where the specifically reported content remained available and users subsequently accessed it, Meta's content-hosting and delivery infrastructure continued to transmit copies of the accused content to those users. The particular content-delivery events, dates, and recipients are recorded in Meta's internal systems.

481. Meta controlled the hosting, content-delivery, account, and group functions through which the identified copying and redistribution occurred. The continued availability of an unauthorized source image permitted additional users to retrieve the work and prepare further unauthorized copies and derivatives. The documented editing chains demonstrate how access to a particular unauthorized source posting was followed by additional acts of reproduction and derivative-image distribution.

482. Plaintiff alleges that Meta's provision and operation of these functions materially assisted the identified direct infringements. Plaintiff further alleges that Meta possessed specific information concerning the works, accounts, groups, and content involved before at least some of the alleged continuation of that activity.

483. Plaintiff does not rely upon the mere availability of Facebook's ordinary ranking, recommendation, notification, advertising, group-discovery, or artificial-intelligence functionality as proof that Meta intentionally induced infringement of Mapes's works. Nor does Plaintiff infer an intent to encourage infringement solely from Meta's receipt of copyright complaints or failure to terminate the identified accounts.

484. The nature, timing, and purpose of any infringement-directed affirmative conduct undertaken by Meta, including any specific promotion, instruction, solicitation, cooperation, or

tailoring of services to facilitate the identified unauthorized uses, must be established by evidence attributable to Meta itself. The existence of generally available platform functions, standing alone, is not alleged to establish such conduct.

485. Plaintiff seeks relief for contributory infringement only to the extent that Meta's identified conduct satisfies the requisite elements of that claim, including the intent requirement applicable to a provider of services under the governing law.

486. Mapes does not allege that merely supplying Facebook Groups, a product capable of extensive lawful use, establishes contributory infringement.

487. Rather, the relevant allegation is that after Meta had acquired specific knowledge that identified groups and posts were being used repeatedly to reproduce Mapes's particular copyrighted works, Meta continued, upon information and belief, to take affirmative actions promoting, distributing, recommending, and returning users to those specific groups and posts.

488. The same distinction applies to Meta's other generally lawful products and features. Mapes does not allege contributory liability merely because Facebook Feed, notifications, recommendations, search, group-discovery systems, advertising systems, or artificial-intelligence tools exist.

489. Mapes alleges liability to the extent Meta intentionally deployed those systems through specific affirmative acts that promoted or facilitated the identified infringement after Meta possessed sufficient information to know what content and activity it was promoting.

490. Upon information and belief, Meta likewise affirmatively facilitated group growth and continued participation through invitations, recommendations, membership prompts, discovery surfaces, notifications, and administrative functionality.

491. To the extent those systems continued to promote identified repeat-infringing editing groups after Meta had received specific information concerning the infringement occurring within

them, those actions increased the number of users capable of participating in the infringement and materially assisted subsequent unauthorized copying.

492. Meta's alleged affirmative conduct also includes its treatment of repeat infringers.

493. Mapes identified users whom she alleges repeatedly obtained, edited, and redistributed her works through the accused Facebook editing ecosystem.

494. In one documented example, Facebook user Madison Dament obtained Mapes's copyrighted imagery through a Facebook editing group with approximately 84,000 members, redistributed the imagery within the group, and offered additional editing services to other users. The evidence further documents the incorporation of Mapes's imagery into a collage posted through Dament's personal Facebook profile in connection with the promotion of editing services. This sequence illustrates how unauthorized copies of Mapes's works moved beyond the original editing-group post and were used in subsequent Facebook content and solicitations. The underlying posts, derivative uses, and cross-distribution evidence are documented in Exhibits D and I.

495. Upon information and belief, Meta possessed internal records linking those acts to the responsible Facebook account and showing prior copyright complaints, removals, strikes, restrictions, and other relevant enforcement history associated with that account.

496. Mapes does not contend that merely permitting such an account to remain active establishes contributory infringement.

497. But to the extent Meta thereafter affirmatively recommended, distributed, notified other users about, resurfaced, or otherwise promoted additional infringing content from that known account, those are separate affirmative acts capable of encouraging and materially assisting additional infringement.

498. Upon information and belief, Meta maintains internal content and image identifiers associated with material hosted through Facebook and with reports concerning that material. This allegation is based on Meta’s content-specific report processing, its ability to identify and act upon

particular reported Facebook locations, and the content identifiers reflected in the reporting materials. Plaintiff does not presently allege that Meta used a particular automated image-matching system on a particular Mapes work.

499. Meta's alleged affirmative involvement also extends to at least one use of a Meta-operated artificial-intelligence feature.

500. Mapes preserved evidence indicating that a derivative version of her protected material associated with the editing-group activity bore a Meta AI watermark.

501. The Meta AI identifier supplies a factual basis to allege, upon information and belief, that a Meta-operated feature participated in generating, modifying, or otherwise processing the accused image.

502. The identifier alone does not establish the particular Meta product used, the user instruction or prompt, the source input, the processing sequence, the resulting output, or whether the processing occurred before or after Meta received notice concerning the underlying work.

503. Those facts, including the relevant input, output, user instruction, product, content identifiers, and processing records, are maintained within Meta's systems.

504. Mapes does not allege that merely offering an AI product capable of lawful use establishes contributory infringement.

505. Plaintiff likewise does not rely on the Meta AI watermark alone to establish contributory intent. The watermark is preserved as evidence potentially identifying Meta-operated processing of an accused derivative; liability depends upon the evidence establishing the product used, the relevant input and output, the responsible conduct, the timing of that conduct, and its relationship to the identified infringement.

506. Meta's knowledge must also be viewed in light of the reporting history alleged above.

507. Mapes alleges that in March 2025, while attempting to report extensive repeat commercial infringement, Meta restricted her ability to submit additional notices through the ordinary reporting mechanism after she had submitted seventeen reports.

508. Mapes alleges that she immediately informed Meta of the restriction and thereafter pursued alternative notice through support tickets, telephone communications, email, counsel, and certified mail.

509. In April 2025 Meta represented that accused content had been removed; Mapes thereafter informed Meta that accused material remained and again supplied the relevant URLs and information.

510. In September 2026, Mapes alleges that Meta's online copyright-reporting mechanisms again would not permit her successfully to submit numerous infringement reports.

511. Mapes therefore transmitted detailed notices directly to Meta identifying the particular works and Facebook locations at issue.

512. Meta's automated responses stated that those reports would not be reviewed unless submitted through Meta's online forms, notwithstanding the fact that the notices themselves advised Meta that those forms were not functioning for Mapes. It is nevertheless probative of the extraordinary specificity of Meta's knowledge when assessing the intent with which Meta thereafter took the affirmative distribution, recommendation, notification, advertising, AI-processing, and other actions alleged herein.

513. By the time of the later conduct, Meta was not merely aware that unidentified users somewhere on Facebook might infringe copyrights. Meta possessed information identifying the copyrighted works, the accused Facebook URLs, the groups or pages in which the material appeared, the recurring editing workflow, and in numerous instances the user or account responsible.

514. Upon information and belief, Meta's own systems operated on those same content, account, group, page, and engagement identifiers when determining whether and how to distribute the accused material.

515. The inference of intent is therefore based upon the relationship between Meta's specific knowledge and Meta's subsequent affirmative conduct concerning the very content and communities that were the subject of that knowledge.

516. Meta's affirmative conduct materially contributed to the direct infringement by increasing the audience exposed to unauthorized source material; returning users to active editing threads; introducing additional users to repeat-infringing groups; facilitating interactions by which source works were obtained and derivatives returned; distributing resulting derivative content; and, where applicable, processing accused derivative material through a Meta-operated AI feature.

517. Those acts supplied more than a remote or incidental connection to the infringement. The direct infringement alleged herein depended upon users obtaining access to Mapes's protected imagery and distributing resulting copies and derivatives to additional users, and Meta's alleged affirmative distribution and engagement systems expanded precisely those opportunities.

518. Mapes therefore alleges that, upon information and belief, after Meta acquired specific knowledge of the infringing activity, Meta intentionally encouraged and assisted additional infringement through specific affirmative acts directed to the identified content, accounts, groups, pages, and identified platform activity.

519. Under Cox Communications, Inc. v. Sony Music Entertainment, a service provider is contributorily liable for a user's infringement only if the provider intended that its service be used for infringement, as shown by inducing the infringement or providing a service tailored to infringement. Plaintiff does not allege that Facebook as a whole was tailored to infringement. Plaintiff alleges inducement through specific affirmative acts undertaken with the purpose of encouraging and

facilitating the identified copying, editing, and redistribution after Meta received particularized notice of the works, posts, accounts, groups, and copying chains at issue.

520. Upon information and belief, after receiving those notices, Meta intentionally continued to select and distribute reported source posts and derivatives, return users to active editing threads, notify users of new editing activity, recommend identified repeat-infringing groups, and facilitate additional participation in the same copying workflows. Plaintiff alleges that Meta undertook those acts to increase participation and content production in the identified editing communities, including the reproduction and adaptation of the specifically reported Mapes works. This inference is based on the work- and URL-specific notices, the observed continuation and multiplication of the same content, the source-to-derivative chains, the reporting restrictions, and Meta's documented operation of the distribution and engagement functions alleged above. Plaintiff believes Meta's recommendation-event, Feed-delivery, notification, group-suggestion, content-matching, and enforcement records will confirm those acts and their timing.

521. Upon information and belief, Meta's systems continued to treat comments requesting edits, completed derivative uploads, reactions, shares, and additional copies as positive engagement signals after Meta had received notice that the underlying posts and groups were being used to reproduce Mapes's identified works. Meta thereby used the infringement-generated activity to circulate the reported posts and groups to additional users and to return participants to the editing threads. Plaintiff alleges that this was affirmative, purposeful conduct directed to increasing the very participation through which the identified infringement occurred, not merely passive failure to remove content or terminate users.

522. Those affirmative acts materially contributed to the direct infringement by expanding access to the protected source material, increasing participation in the identified editing threads, introducing users to the accused groups, facilitating the return of completed derivatives, and distributing resulting copies. Considered with Meta's particularized knowledge, Plaintiff alleges that

the acts manifested the intent to encourage and assist the identified infringement and satisfy the inducement standard. Meta's records identify the particular events, responsible systems and personnel, dates, recipients, and resulting direct infringements, and Plaintiff believes those records will confirm the allegations.

523. Upon information and belief, Meta itself affirmatively acted to distribute, recommend, resurface, notify users concerning, facilitate participation in, process, and/or commercially deliver the identified infringing material after acquiring specific knowledge of the underlying direct infringement.

524. Plaintiff alleges that those affirmative acts, individually and collectively, manifested the requisite intent to encourage and assist the underlying infringement and materially contributed to the direct infringement committed by the Facebook users, page operators, group participants, and other direct infringers identified herein.

525. Meta is therefore contributorily liable for the direct infringement of Mapes's copyrights under 17 U.S.C. §§ 106 and 501.

526. To the extent Meta engaged in such affirmative assistance after receiving specific notice identifying the protected work and infringing activity, Mapes alleges that Meta's contributory infringement was knowing and, where the evidence establishes the requisite state of mind, willful.

527. As a direct and proximate result of Meta's contributory infringement, Mapes has suffered injury including lost licensing value, impairment of the exclusivity of her copyrighted works, widespread unauthorized reproduction and derivative exploitation, commercial substitution, loss of control over distribution of her works, and other damages in an amount to be proven at trial.

528. Mapes is entitled to recover all remedies available under the Copyright Act, including actual damages and profits attributable to the infringement under 17 U.S.C. § 504(b), statutory damages for eligible works and infringements under § 504(c), enhanced statutory damages for willful

infringement where established and available, costs and attorneys' fees where permitted by §§ 412 and 505, injunctive relief under § 502, and such other relief as the Court deems just and proper.

**COUNT II - VICARIOUS COPYRIGHT INFRINGEMENT AGAINST META**

529. Meta possessed the right and practical ability to supervise the identified infringing activity. Meta controlled the Facebook accounts, groups, pages, posts, content-hosting functions, distribution mechanisms, and enforcement tools through which the identified acts occurred. Meta also possessed the authority to remove or disable infringing content and restrict or terminate the accounts, pages, and groups responsible for repeated infringement.

530. Meta's supervisory authority was not merely theoretical. Its communications concerning Mapes's copyright reports demonstrate that Meta could locate and take enforcement action with respect to identified content. Meta also maintained or controlled the account, content, and group identifiers and enforcement records necessary to associate particular uploads, reports, and repeat activity with the responsible Facebook accounts.

531. The identified infringement involved copyrighted photographs and digital artworks that served as the principal source material for particular editing-group activities. In Group ID 1062897731479032, an unauthorized Santa with Magic Snow Globe source posting generated approximately 30 edited responses. In Group ID 1691407778345208, another unauthorized posting of that work generated approximately 15 edited responses. The protected imagery was the subject of the editing requests and resulting user activity.

532. The direct infringements generated identifiable Facebook activity involving the accused works, including source-image views, editing requests, uploads of completed derivatives, comments, reactions, and further distribution of unauthorized copies. That activity was causally associated with the specific unauthorized works rather than merely with Facebook usage in general.

533. Upon information and belief, the identified unauthorized source posts and derivative-edit chains attracted users to the relevant Facebook posts and groups, generated views, comments,

reactions, shares, return sessions, and additional derivative uploads, and produced advertising impressions or other financial benefit associated with at least some of those sessions. This inference is based on the documented multiplication of identified source works into multiple derivative edits and the engagement activity associated with those chains. Meta's impression, recommendation, session, advertising-delivery, monetization, and revenue-allocation records are expected to identify the financial benefit attributable to the identified material.

534. By possessing the right and practical ability to supervise the identified direct infringements while deriving the requisite direct financial benefit from those infringements, Meta is vicariously liable for the underlying infringement to the extent the elements of that claim are established.

535. As a direct and proximate result of Meta's vicarious infringement, Mapes has suffered damages, including lost licensing value, unauthorized commercial substitution, and injury arising from the reproduction, redistribution, and exploitation of her copyrighted works. Plaintiff seeks the remedies available under the Copyright Act, including actual damages, attributable profits, statutory damages where authorized, appropriate injunctive relief, and costs and attorneys' fees where available.

536. Meta possessed both the legal right and the practical ability to supervise or control this Facebook-hosted infringement.

537. Meta owns and operates Facebook and establishes the rules governing the content, accounts, pages, and groups permitted to use the service.

538. Meta possesses the authority and technical ability to remove or disable individual Facebook posts, photographs, videos, comments and other content.

539. Meta possesses the authority and technical ability to restrict, suspend, disable, or terminate individual Facebook accounts and pages.

540. Meta possesses the authority and technical ability to restrict, disable, remove, or otherwise take enforcement action against Facebook groups and their administrators and moderators.

541. Meta maintains internal identifiers and records linking content to the Facebook account that uploaded or published it and linking group content to the relevant group, administrator, moderator, and membership structure.

542. Upon information and belief, Meta likewise possesses the technical ability to restrict the distribution, recommendation, ranking, resurfacing, notification, or other amplification of particular posts, accounts, pages, groups, images, or categories of content without terminating Facebook or Facebook Groups generally.

543. Meta therefore had substantially more than the abstract ability possessed by a remote communications provider to terminate an entire customer relationship. Meta maintained continuous and granular control over the particular content, groups, accounts, pages, and distribution systems through which the direct infringement occurred.

544. Meta also exercised ongoing supervision over Facebook groups and content through its content rules, group policies, moderation systems, account enforcement mechanisms, recommendation systems, copyright procedures, advertising systems, and other platform controls.

545. In numerous instances, Mapes supplied Meta with the information necessary to exercise that control with respect to particular infringements, including specific URLs, group identifiers, account information, registered works, screenshots, and repeat-infringer histories.

546. Meta's right and ability to supervise therefore existed not merely at the level of Facebook as a whole, but at the level of the particular posts, accounts, pages, and groups through which Mapes alleges her works were infringed.

547. Meta also derived an obvious and direct financial benefit from the infringing activity.

548. Mapes does not rely merely upon the generalized allegation that Facebook is supported by advertising or that Meta profits when people use Facebook.

549. Rather, Mapes alleges that the copyrighted material itself functioned as a draw that attracted and retained users and generated identifiable Facebook activity from which Meta obtained commercial value.

550. The identified Facebook editing groups are organized around the acquisition, exchange, alteration, and display of photographs and digital imagery. The availability of images for users to edit is therefore not incidental to their activity; it is a principal reason users visit, join, and participate in those groups.

551. When Mapes's protected imagery was uploaded into those groups as source material, the copyrighted works themselves became the object around which the subsequent user activity occurred.

552. By October 2026, Mapes had identified eighteen editing groups with approximately 2.995 million aggregate memberships.

553. The work-specific draw alleged above must be considered together with Meta's own publicly disclosed advertising model. Upon information and belief, the unauthorized availability of Mapes's works contributed to attracting users to those particular posts and retaining users within those groups because users participated for the purpose of obtaining and manipulating the images being offered.

554. Meta publicly reports that it generates substantially all of its Family of Apps revenue from advertising. For 2025, Meta reported approximately $198.759 billion in Family of Apps revenue, including approximately $196.175 billion in advertising revenue. Plaintiff does not allege that those aggregate amounts are attributable to Facebook alone or to the infringement alleged here; they establish the economic model through which activity on Meta's Family of Apps is principally monetized.

555. Meta further publicly states that marketers pay for advertisements based on the number of impressions delivered or the number of actions, such as clicks, taken by users.

556. Meta states that it recognizes impression-based advertising revenue when an advertisement is displayed to a user and recognizes action-based advertising revenue when the contracted user action occurs. Meta further states that it controls the advertising inventory through which those advertisements are delivered.

557. That advertising model remained operative during the period alleged here. In the second quarter of 2026 alone, Meta reported approximately $59.363 billion in advertising revenue, while advertising impressions delivered across its Family of Apps increased approximately 14% year over year.

558. Facebook's own public materials further state that members of public Facebook groups see group content in their Feed and elsewhere on Facebook. Activity generated within public editing groups therefore forms part of the Facebook content environment through which users consume content and Meta delivers advertising inventory.

559. Meta's own publications establish that Groups attract users to Facebook, generate continuing engagement, and supply content for distribution through News Feed. Meta states that many users come to Facebook to view content from their groups and that Meta measures how frequently users engage with a group and how frequently the group posts, then uses those signals to place group content higher in News Feed. Facebook head Tom Alison likewise stated that users come to Facebook for features including Groups, that their use of those features drives broader engagement, and that those users then view content in Feed and Reels. The same article explains the importance of those audiences to the advertisers responsible for most of Meta's advertising revenue. (See Exhibits. O and P, full articles.)

560. The accused editing groups used Mapes's photographs and digital works as the content that attracted and sustained group activity. Users posted Mapes's works as source material, requested edits, created and posted derivative versions, viewed and commented on the resulting content, shared it, and returned to participate in additional activity. Exhibit N confirms that Mapes's works are a

substantial audience draw capable of generating millions of views, hundreds of thousands of engagements, extensive non-follower distribution, and measurable earnings. The accused infringement generated the same categories of activity that Meta measures and uses to rank, distribute, and monetize content: views, clicks, comments, shares, derivative responses, repeat visits, and continued group participation. (See Exhibit N.)

561. Plaintiff alleges on information and belief that Meta received a direct financial benefit from the identified infringement because Mapes's works supplied the draw that attracted users to the accused groups, increased participation and time spent on Facebook, and generated engagement signals that Meta used to rank, recommend, distribute, and resurface the infringing activity through Feed, notifications, group recommendations, and other Facebook surfaces. Meta monetized the resulting traffic and engagement through advertising impressions and other compensated user activity. The direct financial benefit arose from the identified infringing works' role in generating and sustaining that monetizable activity. Meta's content, recommendation, session, impression, advertising-delivery, monetization, and revenue-allocation records will confirm the resulting impressions, monetized interactions, and revenue attributable to the identified infringement. (See Exhibits. N, O, and P.)

562. The infringement alleged here supplied the content around which identifiable Facebook activity occurred. Users did not merely encounter Mapes's images incidentally; they obtained the images in order to edit them, requested edits, created and uploaded derivatives, viewed other users' derivatives, commented and reacted, and returned as additional edits accumulated.

563. The evidence also documents expansion beyond an initial source post. As alleged above, one repeat user obtained Mapes's work through an over 83,000-member editing group, redistributed and edited the work within that group, and thereafter redistributed the work publicly while offering additional edits, thereby creating an additional audience and additional Facebook activity centered on the same copyrighted work.

564. Mapes's digital backgrounds also formed the basis of commercial services offered by Mapes herself. A lawful customer could purchase a limited background license and separately purchase Mapes's compositing services to incorporate an in-person photograph into that background. In the accused editing groups, by contrast, the same background could be distributed to members without authorization and then used by group participants to provide competing editing services, whether for compensation or without charge. The unauthorized source image thus functioned as the central input for the particular editing activity, requests, completed composites, and resulting Facebook engagement alleged herein.

565. Plaintiff does not allege that every view, edit, comment, reaction, or return visit necessarily produced a separately monetized advertisement. Rather, Plaintiff alleges that the identified infringement generated additional Facebook content consumption and user activity of the kind Meta principally monetizes through impressions and user actions and that, upon information and belief, at least some resulting sessions and content-delivery events generated additional advertising impressions or monetizable user actions.

566. Meta maintains the records necessary to quantify that causal relationship, including post-level and content-level impressions, Feed distribution, unique and repeat viewers, comments, reactions, derivative uploads, notifications, session activity, advertisements delivered during resulting sessions, advertising impressions, and associated revenue.

567. The alleged financial benefit is therefore not simply that Facebook contains both infringement and advertising. It is that identified unauthorized Mapes works themselves attracted and sustained identifiable Facebook activity, thereby creating additional content consumption, advertising opportunities, and, upon information and belief, revenue-generating impressions or user actions for Meta.

568. The multiplication of Mapes's works into numerous derivatives increased this financial benefit. A single infringing source post could generate dozens of additional pieces of Facebook content and repeated user interactions rather than one isolated image view.

569. The economic significance of the derivative-edit process is that a single unauthorized Mapes photograph could support numerous separately displayed pieces of Facebook content. Where a source post generated approximately 30 derivative responses, the protected image became the basis for repeated copying and additional content displayed within the same Facebook environment. Each resulting image could attract its own viewers and interactions and could cause participants to return to the underlying discussion. The alleged benefit to Meta was therefore not limited to any audience reached by the initial source upload, but potentially included additional advertising opportunities generated by successive posts, responses, and visits attributable to continued exploitation of the same copyrighted work.

570. Each derivative upload or comment could, upon information and belief, create additional Feed impressions, notifications, page views, return visits, and opportunities for Meta to display paid advertisements.

571. Accordingly, the same infringement that multiplied Mapes's unauthorized copies also multiplied the Facebook activity available for Meta to monetize.

572. The direct financial relationship is further illustrated by infringement appearing on high-reach Facebook pages.

573. On September 27, 2026, Mapes identified an unauthorized use of a photograph registered within Horror Halloween Tara Mapes, Registration No. VA0002464853, on the Facebook page Weirdo History Facts, which Mapes documented as having more than 900,000 followers.

574. In her notice, Mapes specifically requested preservation of "all monetization records for this page and for Meta related to this high performing post."

575. Upon information and belief, Meta possesses records showing whether and to what extent that identified infringing post generated impressions, recommendations, user engagement, advertising impressions, monetized sessions, or revenue for Meta.

576. The Weirdo History Facts infringement presents a discrete example in which the unauthorized Mapes photograph was used as the subject of content distributed to an established Facebook audience. At the time of Mapes's September 27, 2026 notice, the page was documented as having more than 900,000 followers. The accused use involved an identified photograph within Horror Halloween Tara Mapes, Registration No. VA0002464853. The photograph was not merely incidental to an unrelated discussion; it constituted the visual subject matter of the accused publication. The resulting post and its associated Facebook content identifier provide a means of determining the audience reached, the engagement attributable to the photograph, any revenue-generating advertising events associated with that audience, and whether the responsible account participated in Meta's content-monetization programs. The underlying copyrighted photograph, the accused Facebook use, the September 27, 2026 notice to Meta, and the associated high-reach page evidence are identified and documented in Exhibits A, B, H, and L, respectively.

577. The accused photograph was itself the subject of the Weirdo History Facts post. Its role in generating the post’s audience, engagement, and any resulting monetized activity may be evaluated through the post-level information maintained by Meta. Mapes does not presently assign an unsupported dollar amount to revenue attributable to that particular post.

578. Where such a post attracted viewers because of Mapes’s unauthorized photograph, the protected work itself operated as part of the draw producing the Facebook audience Meta was able to monetize.

579. Facebook publicly states that members of public Facebook groups see group content in their Feed and elsewhere on Facebook. The accused editing-group activity therefore was capable

of producing Facebook content-delivery events beyond a member manually retrieving a privately stored file.

580. Upon information and belief, Meta's Feed, notification, resurfacing, group-discovery, and content-delivery systems further distributed the identified accused content and returned users to the editing activity described above. Those events increased the audience exposed to the works and the user activity attributable to the infringement. Plaintiff believes Meta's post-level and content-level records will confirm the impressions, recommendations, notifications, repeat visits, derivative uploads, advertising impressions, and resulting revenue associated with the identified content.

581. Upon information and belief, at least some sessions initiated or prolonged by users viewing, obtaining, editing, or responding to the unauthorized Mapes works included paid advertising impressions or other monetized actions from which Meta received revenue. This inference is based on Meta's publicly described impression- and action-based advertising model, the observed work-specific activity, the number of derivative responses generated by identified source posts, and the high-reach commercial-page examples. The claim concerns revenue tied to the identified infringement-related activity, not Meta's aggregate advertising revenue.

582. The unauthorized works themselves supplied the draw for the accused editing requests, derivative responses, repeat visits, and high-reach page views. Meta possessed the right and practical ability to supervise the identified posts, accounts, pages, groups, and distribution functions while receiving the financial benefit generated by at least some of that work-specific activity. Plaintiff therefore alleges that Meta is vicariously liable for the predicate infringements.

583. Plaintiff does not contend that Meta’s general advertising revenue, standing alone, satisfies the direct-financial-benefit requirement. The claim concerns revenue sufficiently connected to the specific infringing activity identified herein.

584. Meta therefore had an obvious and direct financial interest in the direct infringement alleged herein, rather than merely a generalized financial interest in Facebook usage as a whole.

585. At the same time, Meta possessed the right and ability to supervise or control the conduct by removing the identified content, restricting or terminating the accounts and pages responsible for it, taking action against the identified groups and administrators, limiting the distribution and recommendation of accused content, enforcing repeat-infringer policies.

586. Notwithstanding that ability, and after receiving extensive notice concerning the specific works, content, groups, pages, and accounts at issue, Meta permitted the direct infringement alleged above to continue and, as alleged elsewhere, continued through its own systems to distribute, recommend, notify users about, and monetize at least portions of that activity.

587. By possessing the right and ability to supervise and control the identified direct infringement while obtaining an obvious and direct financial benefit from that infringement, Meta is vicariously liable for the direct infringements of Mapes's copyrights.

588. As a direct and proximate result of Meta's vicarious infringement, Mapes has suffered damages, including lost licensing value and injury resulting from widespread uncontrolled reproduction and exploitation of her works.

589. Upon information and belief, Meta has received profits attributable to the identified infringement-related activity in an amount to be proven at trial. Meta's financial, impression, session, monetization, and revenue-allocation records are expected to quantify those attributable profits.

590. Mapes is entitled to all remedies available under the Copyright Act, including her actual damages and Meta's profits attributable to infringement under 17 U.S.C. § 504(b), statutory damages for eligible works and acts under § 504(c), costs and attorneys' fees where available, injunctive relief, and such other relief as the Court deems appropriate.

## COUNT III — VIOLATION OF 17 U.S.C. § 1202(b)(3) AGAINST META

591. Plaintiff repeats and realleges the preceding paragraphs as though fully set forth herein.

592. Mapes's authorized copies of the works identified below displayed copyright-management information within the meaning of 17 U.S.C. § 1202(c), including visible authorship and ownership information identifying Tara Mapes and her photography or digital-art business. The precise markings and their placement are depicted in the authorized source images and comparisons preserved in Exhibit J. For each representative Section 1202 violation, Plaintiff identifies the original work, the original copyright-management information, the accused altered or derivative version, the removed, altered, or substituted information, the responsible account where known, and the Facebook location through which the work was distributed.

593. The Bear in Forest Looking Down and Bear in Foggy Forest examples pleaded below are specific instances for which Plaintiff has preserved CMI-specific notices and evidence of continued post-notice availability. They do not represent the full scope of the accused CMI alterations. Exhibits J and J-1 document additional works, altered copies, and Facebook content identifiers, including multiple images associated with Angelic Ice Photography. Plaintiff alleges that Meta's liability under Section 1202(b)(3) extends to additional identified post-notice distributions only to the extent the evidence establishes that Meta possessed the required knowledge of unauthorized CMI removal or alteration and knew, or had reasonable grounds to know, that the distribution would induce, enable, facilitate, or conceal infringement.

594. The authorized Bear in Forest Looking Down and Bear in Foggy Forest images contained visible Mapes authorship or ownership markings, including identifying information associated with Tara Mapes and taramapes.com, as reflected in the preserved source-to-accused comparisons.

595. The corresponding accused Angelic Ice Photography copies reproduced protected expression from those works while omitting the visible Mapes authorship or ownership markings and displaying Angelic Ice Photography or Angelic Ice Fantasy & Styled Photography branding. Mapes

did not authorize that removal, alteration, substitution, or the subsequent distribution of copies bearing the unauthorized changes.

596. On March 24, 2025, Mapes transmitted notices to Meta at ip@fb.com identifying the unauthorized alteration of copyright-management information associated with Bear in Forest Looking Down and Bear in Foggy Forest. Those notices identified accused Facebook content bearing photograph identifiers 1155015282862600, 976623264035137, and 1121642829533179 and expressly stated that the infringer had removed Mapes’s watermark in violation of 17 U.S.C. § 1202.

597. After Meta received the March 24, 2025 notices, the accused altered Bear in Forest Looking Down copy bearing Facebook content identifier 1155015282862600 remained accessible when Mapes checked on May 2, 2025. The accused altered Bear in Foggy Forest copy bearing Facebook content identifier 1121642829533179 likewise remained accessible on May 2, 2025. Those are the same content identifiers identified in the March 24 notices that expressly advised Meta that Mapes's watermark or other copyright-management information had been removed or replaced without authorization. The March 24 notices and their identified Facebook content identifiers are preserved in Exhibit G, and the corresponding authorized-to-accused CMI comparisons are preserved in Exhibit J.

598. Upon information and belief, during the documented period after Meta received the CMI-specific notices and before the identified altered copies were actually removed or disabled, at least some users accessed those Facebook photographs, causing Meta's content-delivery infrastructure to transmit the altered image files for display. This inference rests on the same content identifiers appearing in the March notice record and the May 2 availability verification, together with Meta's demonstrated ability to process and act upon photograph-specific URLs. Plaintiff believes Meta's file-version, delivery, impression, access, and removal records will confirm the dates, recipients, and number of post-notice transmissions.

599. At the time of those transmissions, Meta had received image-specific notice identifying the authorized works, the accused copies, the Facebook content identifiers, the removal or replacement of Mapes's CMI, and the absence of authorization. Meta therefore knew that the CMI had been removed or altered without authority.

600. Meta also knew, or had reasonable grounds to know, that distributing the accused copies without Mapes's authorship and ownership information would induce, enable, facilitate, or conceal infringement. The notices identified a repeated commercial infringement pattern in which Mapes's works were copied, rebranded, displayed, and used as the basis for additional unauthorized reproductions and derivatives. Distribution of the rebranded copies concealed Mapes's authorship and ownership, attributed or appeared to attribute the works to Angelic Ice, diverted recognition and potential licensing opportunities away from Mapes, and facilitated further unauthorized reproduction, redistribution, and commercial exploitation without identifying the actual copyright owner.

601. Plaintiff does not allege that Meta itself removed or altered Plaintiff's copyright-management information. Plaintiff alleges that identified Facebook users removed or altered visible copyright-management information displayed on Mapes's authorized works and that Meta received specific notice identifying that claimed alteration. Plaintiff further alleges, upon information and belief, that Meta thereafter engaged in identified post-notice distribution acts concerning reported material, subject to proof of the statutory knowledge requirements.

602. As a direct and proximate result of Meta's violations of Section 1202(b)(3), Mapes suffered injury and seeks the remedies provided by 17 U.S.C. Section 1203, including actual damages and attributable profits or, at Mapes's election and to the extent authorized, statutory damages for each proven violation, appropriate injunctive relief, costs, reasonable attorneys' fees as permitted by law, and other appropriate relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and grant the following relief:

a. A declaration that Defendant is liable for the claims asserted in this Complaint;

b. Preliminary and permanent injunctive relief prohibiting Defendant from continuing the actionable conduct established in this action;

c. Plaintiff's actual damages and Defendant's profits attributable to the infringement, to the extent proven;

d. Statutory damages for eligible registered works and eligible infringements, to the extent authorized by law;

e. Damages, costs, and attorneys' fees to the extent authorized by law;

f. Prejudgment and post-judgment interest as allowed by law; and

g. Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 2, 2026
Brooklyn, New York

JONES INTELLECTUAL PROPERTY

By: ____________
Michael Ryan Jones
44 Court Street #1217
Brooklyn, New York 11201
(718) 500-0115
mjones@jonesipl.com

*Counsel for Plaintiff Tara Mapes*

## ENCLOSED EXHIBITS TO COMPLAINT

**Exhibit A**: Copyright Registration, Work, and Accused Facebook URL Schedules, Including Representative Registered Images.

**Exhibit B**: Representative Side-by-Side Comparisons of Plaintiff's Original Copyrighted Works and Accused Infringing Facebook Uses.

**Exhibit C**: Identification and Summary of Known Facebook Editing Groups Associated with the Alleged Infringement.

**Exhibit D**: Representative Facebook Editing-Group Infringement and Redistribution Chains, Including Source Posts and Resulting Derivative Images.

**Exhibit E**: Representative Factual Chronology of Infringement Associated with Angelic Ice Photography and Tanisha Lloyd.

**Exhibit F**: Historical Copyright Infringement Reports, Communications, and Reported Facebook URL Summaries.

**Exhibit G**: March–May 2025 Angelic Ice Copyright Notices, Reporting Restrictions, Communications, and Post-Notice Chronology.

**Exhibit H**: Representative Meta Copyright Reporting Failures, Direct Copyright Notices, and Meta Responses.

**Exhibit I**: Representative Repeat-Infringer Activity and Cross-Distribution of Plaintiff's Copyrighted Works.

**Exhibit J**: Representative Evidence of Removal, Alteration, and Replacement of Copyright Management Information.

**Exhibit J-1**: Representative Angelic Ice Facebook content identifiers associated with removal alteration or replacement of Mapes copyright management information

**Exhibit K**: Representative Evidence Concerning New York Connections to the Accused Facebook Accounts, Administrators, and Groups.

**Exhibit L**: Representative High-Reach and Commercial Facebook Infringement, Including Accused Uses by Commercial Pages and Accounts.

**Exhibit M**: Representative Comparisons of Meta's Copyright-Removal Representations and Plaintiff's Evidence of Continued Availability or Infringement.

**Exhibit N**: Representative Facebook Creator Dashboard and Post Insights Showing Engagement, Reach, Non-Follower Distribution, and Approximate Earnings Associated with Plaintiff's Works.

**Exhibit O**: Ramya Sethuraman et al., *Using Surveys to Make News Feed More Personal*, Meta Newsroom (May 16, 2019).

**Exhibit P**: Katie Paul, *Meta's Facebook Says It Is Attracting Most Young Adults in 3 Years*, Reuters (May 31, 2024).